**TELEBRANDS DIRECT RESPONSE CORPORATION, a Virginia corporation, Plaintiff,**

v.

**OVATION COMMUNICATIONS, INC., a California corporation, Defendant.**

Civ. A. No. 91–4388.

United States District Court,
D. New Jersey.

Feb. 24, 1992.

Sills Cummis Zuckerman Radin Tischman Epstein & Gross by Robert M. Axelrod, Newark, N.J., Cooper and Dunham by Thomas G. Carulli, New York City, for plaintiff.

Peckar & Abramson by Eugene Sullivan, River Edge, N.J., Venable, Baetjer, Howard & Civiletti by James R. Myers, Washington, D.C., for defendant.

## OPINION

BISSELL, District Judge.

Telebrands Direct Response ("Telebrands"), a consumer products marketing company organized under the laws of the Commonwealth of Virginia with headquarters in Wayne, New Jersey, initiated this action on October 3, 1991 with the filing of a declaratory judgment complaint. That complaint, which sought an injunction against any lawsuit brought by the defendant in jurisdictions outside the district of New Jersey, claimed that Ovation Communications' ("Ovation") Thighmaster exercise product is not entitled to trade dress protection because it is a purely functional device. Ovation is a California corporation with its principal place of business in Los Angeles.

Ovation responded on October 15, 1991 with an answer and counterclaim and filed a cross-motion for preliminary injunctive relief asserting that Thighmaster was entitled to trade dress protection because its design was primarily aesthetic, rather than functional. The battle thus joined, the parties appeared before this Court on October 22, 1991 for oral argument. After a full-day hearing, the Court granted Telebrands limited injunctive relief and denied Ovation's cross-motion. The court ordered that:

Plaintiff's application for a preliminary injunction be and the same hereby is granted, to the following extent only: defendant Ovation Communications, Inc., its officers, agents, servants, employees, attorneys and all others in active concert or participation with them, are preliminarily enjoined from instituting or prosecuting any civil actions other than before this Court against the plaintiff which arise from plaintiff's marketing of its "Thighshaper" or "Thighsizer" product [Telebrands' competing product].

(Order on Cross–Applications for Preliminary Injunctive Relief, dated November 22, 1991).

At the request of the parties, however, the Court agreed to withhold entry of judgment and the accompanying bench opinion so that counsel could pursue settlement talks. Those negotiations broke off, but plaintiff moved on November 18, 1991 to enforce what it believed was a settlement agreement. The Court invited the parties to return on November 21, 1991, this time to argue whether they had in fact settled the case, and after another full-day hearing, concluded with some sadness that they had not. On the following day, the Court announced its decision and also entered the judgment on the applications for a preliminary injunction that had been reached but withheld exactly one month before.

On November 20, 1991, Ovation filed a motion to dismiss the case for improper venue, or in the alternative, to transfer the case to the Central District of California where defendant was prosecuting related civil actions. On December 2, 1991, defendant also filed with the Third Circuit an appeal of this Court's denial of Ovation's request for preliminary injunctive relief.

On another front, the original owners of the Thighmaster device had filed an application with the U.S. Patent and Trademark Office ("PTO") for a design patent. After the Court released its opinion denying trade dress protection in late November, a copy of the Court's opinion was submitted to the PTO for its consideration along with the application. On December 31, 1991, the PTO issued design patent No. D322,827 (the "'827 Patent") protecting the shape of Ovation's Thighmaster for the 14–year statutory period.

Three days later, on January 3, 1992, Ovation moved for a preliminary injunction, asking this Court to order that:

Plaintiff Telebrands Direct Response Corporation ("Telebrands"), its agents, employees, successors, attorneys, and all persons in active concert and participation with it, are hereby restrained and enjoined until the trial on the merits from engaging in the making, using, distributing, selling and/or offering for sale of any product which incorporates the ornamental design claimed in United States Design Patent No. D322,827, including, but not limited to, Telebrands' THIGH SHAPER exercise product and any colorable limitations thereof....

The Court set this matter down for a hearing on January 27, 1992. After defendant requested an adjournment, the Court agreed to hear the parties on February 10. Subject matter jurisdiction is based upon federal questions arising under the Lanham Act, 15 U.S.C. § 1125(a), as well as diversity of citizenship between the parties under 28 U.S.C. § 1332.

## FACTS

Ovation is a California marketing company that sells other company's products through retail outlets and direct response marketing. Direct response marketing consists essentially of television and print advertising pitches inviting consumers to order the product by mail or phone. Thighmaster is one of Ovation's more successful marketing ventures. The product is a spring-coiled exercise device used primarily for thigh exercises, but handy for chest and arm routines as well. It was developed by an eclectic (although not unrepresentative) group of Californians that included a television producer, a "psychic advisor," the owner of a health spa and an entrepreneur with a bachelors degree in psychology.[1] (Reply Br. at 2). The group,

---

1. Anne–Marie Bennstrom, Leslie Sinclair, George Reynolds and Stephen A. Schwartz, are

known as V–Partners, had acquired the rights to a functionally similar device, known as the V–Bar, and then redesigned it for greater aesthetic appeal. (Bieler Decl., ¶ 3). Thighmaster was born.

Mr. Reynolds, the entrepreneur who collaborated on the redesign of the V–Bar and whose prior inventions include the "Mood Ring," testified that the studies leading up to the design of the Thighmaster related not to the functional requirements of an exercise device, but rather, "a study in the Jungian psychology and force of certain symbols on the psyche." (Reynolds Dep. at 173 (cited in Reply Br. at 2)). He recounted his creative methodology as follows:

> [O]ur primary objective was to come up with a design that caught people if not consciously, unconsciously, subconsciously, with a basic primal archetypal design, so the symbol, the butterfly, which if you take a V-toner and hold it up like this in the V-shape, it looks like butterfly wings, and that's actually what I saw in a meditative state at 2:00 in the morning when my wife was beside me, and the infinity symbol basically as I drew it was what we agreed to....[2]

Once the V–Partners agreed to the infinity shape, they contacted 30 to 40 manufacturers who recommended altering the design to lower production costs. According to the inventors, they "persevered in building and patenting a design that is more costly and less functional than the original 'V–Bar,' but aesthetically more appealing, particularly on television." (Reply Br. at 3). Having settled on the preferred design, V–Partners' lawyers prepared a design patent application for the Thighmaster and filed that application with the PTO on February 2, 1990. (Parret Aff., 10/11/91, ¶ 3, Exh. A). Later that year, V–Partners entered into an agreement with Ovation to manufacture and market Thighmaster. (Bieler Decl., 10/11/91, ¶ 3).

Since acquiring the rights to Thighmaster, Ovation took the following steps to market the product: In January 1991, Ovation engaged celebrity Suzanne Somers to appear in a direct response television commercial promoting the product (Bieler Decl., ¶ 5); in March 1991, Ovation began test broadcasting the commercial and by the early summer was running the advertisement in over 150 television markets including CNN, USA, ESPN and MTV (id.); in August 1991, Ovation hired a national retail sales manager and 11 regional sales representatives to introduce the product into the retail market (id., ¶ 6). To date, Ovation has spent in excess of $7 million in advertising. But the investment has paid off. Sales grew from less than 200 per week in March 1991 to over 35,000 per week in August of that same year.

As sales skyrocketed, other marketing companies approached Ovation to discuss sharing distribution rights. In August 1991, a representative of Telebrands offered to distribute Thighmaster exercisers in various markets, including retail stores. (Bieler Decl., ¶ 7). Ovation declined, but agreed to reconsider the offer in 1992. Telebrands initially responded by marketing a thigh exercise device of its own that bore little resemblance to the Thighmaster. (Id., ¶¶ 9–10).

Others followed Telebrands' lead. In response, Ovation obtained a preliminary injunction in the Central District of California on September 13, 1991 enforcing trade dress protection of the Thighmaster against an alleged infringer who was also accused of misrepresenting the identity of his product. (Memo. in Support of Motion to Dismiss for Improper Venue, Exh. A). At about the same time, Telebrands began running advertisements for an exercise device called the Thighshaper which was, unlike its earlier product, almost identical to the Thighmaster. (Bieler Decl., ¶ 11). With the entry into the market of a clear "knock-off" version of Thighmaster, Ova-

---

members of the California partnership, known as V–Partners, that acquired the rights to the V–Bar and subsequently redesigned it into the "infinity" shaped Thighmaster. (Parrett Aff., 10/11/91, ¶ 2; Bieler Decl., 10/11/91, ¶ 3).

**2.** Fortunately, the decision on the present application does not depend upon the weight or credibility of this testimony.

tion and Telebrands explored again the possibility of a licensing agreement. But talks broke off amid mutual recriminations, provocations and threats of suit. (*Id.*, ¶ 17). On October 3, 1991, Telebrands filed the declaratory judgment complaint which began this lawsuit.

## VENUE ANALYSIS

■ Defendant Ovation has moved for a dismissal of this case for improper venue, or, alternatively, a transfer to the Central District of California. This Court has the authority to transfer a civil action to any other district where it might have been brought. In making such a transfer, it is to be guided by a concern for the convenience of the parties and witnesses and the interests of justice, 28 U.S.C. § 1404(a). Dismissal is the unfavored remedy in situations where venue is challenged and is to be avoided when another court may properly exercise jurisdiction over the matter. In this case, Ovation seeks a transfer to the Central District of California, where its business is located, where the action could have been brought, and hence, where this Court could transfer the case if the private and public interests warrant such a transfer. After careful review of these interests, however, the Court concludes that transfer is not warranted and that venue is proper here in New Jersey.

■ As first explained by the Supreme Court in *Gulf Oil v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1946), the Court must review factors falling into two broad categories: the private interests of the parties and the public interest in the administration of the courts. *See also Sandvik v. Continental Insurance Co.,* 724 F.Supp. 303, 307 (D.N.J.1989) (elaborating the *Gilbert* standard). As the Third Circuit has noted, since broad legal standards must govern the myriad factual circumstances giving rise to contests over venue, a motion to transfer based on convenience will rest within the sound discretion of the district court. *See Lony v. E.I. Du Pont de Nemours & Co.,* 886 F.2d 628, 631 (3d Cir.1989).

■ Plaintiff Telebrands has argued strenuously in its brief that Ovation waived any objection to venue back in October 1991 when it filed in this Court an answer, counterclaim and cross-motion for preliminary injunctive relief. The Court does not view Ovation's vigorous defense of its position in this Court in response to a lawsuit filed by its adversary as indicative of the defendant's consent to venue in New Jersey. As Ovation notes, any argument that it was content with jurisdiction in New Jersey because it defended itself with responsive pleadings is no more than a strained attempt "to manufacture a waiver out of actions born of necessity." (Reply Br. at 9).

■ Having put that argument aside, the Court is left with a more serious obstacle for transferring venue. As the parties will recall, the Court entered a preliminary injunction on November 22, 1991 enjoining Ovation from "instituting or prosecuting any civil actions other than before this Court against the plaintiff which arise from plaintiff's marketing of its 'Thighshaper' or 'Thighsizer' product." The filing of an appeal on an interlocutory matter transfers jurisdiction from the district court to the court of appeals at least over the issues which are on appeal. *See, e.g., United Parcel Service, Inc., v. United States Postal Service,* 475 F.Supp. 1158, 1162–63 (E.D.Pa.1979). In this Court's mind, one of the purposes of the injunction, which was drawn quite narrowly, was to confine the venue of the dispute between Telebrands and Ovation to this Court so that the plaintiff would not have to defend itself against suit in multiple fora through the country. That is the heart of the injunction and the main issue on appeal.

But Ovation disagrees. It claims that the injunction applies only to *new* suits against Telebrands, not the existing action for which they urge transfer. There is little basis in logic or the language of the injunction to support this creative interpretation. The injunction was designed to settle the parties' dispute in New Jersey, not divide the action between "old" and "new" filings, some of which would be transferred

and others of which would stay here. The relevant portion of the injunction reflects this logic: Ovation is "enjoined from instituting *or prosecuting any* civil actions other than before this Court...." (Emphasis added). This language is broad and inclusive: all suits here. Since the injunction directs the parties here, venue is clearly on appeal and a transfer at this time would divest the Third Circuit of jurisdiction over the appeal, something this Court is not about to do.

 Even if this jurisdictional feature were absent, the Court would be inclined to retain this case. As the courts of this circuit have noted, "unless the balance of convenience of the parties is *strongly* in favor of defendant, the plaintiff's choice of forum prevails." *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir.1970); *Lony v. E.I. Du Pont de Nemours & Co.*, 886 F.2d 628, 631 (3d Cir.1989). Although Telebrands is organized under the laws of the Commonwealth of Virginia with a warehouse in that State, the company's principal place of business is here in New Jersey, with all but one of its executives here and all of its other employees here.[3] Moreover, while Ovation has certainly impressed upon this Court the fact that its office, personnel, witnesses and other proofs are located in Los Angeles, that interest is counterbalanced by the fact that Telebrands' personnel, witnesses and documentary evidence are all here in New Jersey.

Finally, while the Court is aware that defendant has recently filed a number of related suits in the Central District of California, transfer would not advance the public interest in conserving judicial resources. Like it or not, the District of New Jersey has already invested substantial resources in the adjudication of this dispute. This Court has already decided three motions in this case, presided over two full days of evidentiary hearings, attempted a settlement conference, reviewed dozens of certifications, affidavits and other proofs and absorbed the weekly arrival of new briefs. Transferring this case to another district would not conserve judicial resources, it would waste them. Accordingly, the Court will deny defendant's motion for transfer and turn now to the merits of its claim for preliminary injunctive relief.

## PRELIMINARY INJUNCTION ANALYSIS

 Defendant has asked this Court to enjoin Telebrands from engaging in the manufacture, distribution or sale of any product which "incorporates the ornamental design claimed in United States Design Patent No. D322,827, including, but not limited to, Telebrands' THIGH SHAPER exercise product and any colorable imitations thereof...." The primary purpose of a preliminary injunction is to preserve the status quo pending final determination of the action after a full hearing. *See In re Arthur Treachers' Franchisee Litigation*, 689 F.2d 1150 (3d Cir.1982). The Third Circuit requires a party seeking a preliminary injunction to bear the burden of producing evidence sufficient to convince the court that (1) the movant has shown a reasonable probability of success on the merits, (2) the movant will be irreparably injured by a denial of relief, (3) granting preliminary relief will not result in even greater harm to the other party, and (4) granting preliminary relief will be in the public interest. *See SI Handling Systems,*

---

**3.** For purposes of venue analysis, a corporation is deemed to reside in any judicial district "in which it is subject to personal jurisdiction at the time the action was commenced." 28 U.S.C. § 1391(d) (1988 & Supp.1991), *as amended by* Act of Nov. 19, 1988, Pub.L. No. 100–702, 102 Stat. 4669 (1988). In arguing that this Court does not have personal jurisdiction over the defendant, Ovation emphasizes the fact that less than four percent of its sales of the Thighmaster are made in New Jersey. (Defendant's Motion in Support at 2; Bieler Decl. at 9). This statistic does not support defendant's transfer motion.

Jurisdictional contacts are not measured quantitatively from the defendant's bottom line. Due process "is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum.... and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Ovation advertises extensively in New Jersey, both through national media and local channels, and sells thousands of Thighmasters in this State every month.

*Inc. v. Heisley,* 753 F.2d 1244, 1254 (3d Cir.1985). The applicant must meet its burden on the first two points in order for the Court to consider the third and fourth factors. (*Id.*) The Court believes that defendant has met its burden on all four points and that its request for injunctive relief should be granted until such time as this Court is able to adjudicate the matter more fully on the merits.

### Probability of Success on the Merits

Since this controversy began several months ago, the recurring question facing this Court has been whether the design of the Thighmaster is functional, or aesthetic, or both. In product design, as in so many things observed, the true answers rarely lie in one descriptive category exclusively, but in some combination of both. But the gray area is neither a refuge nor an excuse, for it remains the Court's duty to locate which of these established categories that compete in the law predominate in fact. And while a mix of characteristics may prove insufficient for trade dress protection, it is sufficient for upholding a design patent.

■ The present motion for injunctive relief comes to us immediately following the PTO's issuance of Design Patent '827, which protects for the statutory period of 14 years the infinity-shaped configuration of the Thighmaster. In seeking a preliminary injunction to prevent the violation of a patent right, 35 U.S.C. § 283, likelihood of success on the merits is established by demonstrating both that the patent is *valid* and that the patent has in fact been *infringed. See Hybritech Inc. v. Abbot Laboratories,* 849 F.2d 1446, 1451 (Fed.Cir. 1988) (emphasis added).

■ Upon the acquisition of a patent, it is presumed to be valid, 35 U.S.C. § 282, and at trial the accused infringer must overcome that presumption by proving its invalidity by clear and convincing evidence.

*See Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,* 806 F.2d 1565, 1570 (Fed.Cir. 1986). While accused infringers often overcome this heavy burden by offering persuasive proofs,[4] it is important to note that the presumption of validity reflects the deference owed patent examiners who are trained in interpreting prior art and evaluating comparable art for purposes of determining whether a patent should issue. *See Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve,* 796 F.2d 443, 447 (Fed. Cir.1986), *cert. denied,* 484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987).

■ In addition to this standard basis for deference, the Court finds that the patent issued in this case merits an added degree of respect since it was not issued pursuant to the usual *ex parte* PTO proceeding, but rather, subject to *inter partes* input from Telebrands, an opponent of the patent.[5] Included in the materials considered by the PTO examiner was this Court's earlier opinion finding that the Thighmaster product was a substantially functional one and that an imitative product such as Telebrands' Thighshaper did not infringe on any purported trade dress right. While the PTO study was certainly not a full blown adversarial hearing, it did incorporate competing views, a step which certainly bolsters the credibility of its ultimate conclusion that (for patent purposes) the Thighmaster design is primarily aesthetic.

■ Telebrands has nonetheless challenged the PTO's work as procedurally deficient and hence suspect. Relying largely on the affidavit of Donald J. Quigg, former United States Commissioner of Patents and Trademarks from 1985 to 1989, it complains that the title of the product on the "file wrapper" was inaccurate, since it listed the product as a "Hand Exerciser or Similar Device" instead of the formerly submitted "Design for an Exercise Device." Plaintiff is correct in arguing that

---

4. According to one recent study, the percentage of design patents held invalid from 1983 to 1986 was 60 percent. *See* Note, *Future of Design Protection in the United States: An Analysis of the Proposed Domestic System in View of Recent Developments in the United Kingdom, New Zea-* *land and Australia,* 20 J. Marshall L.Re. 261, 267 n. 33 (1986).

5. The protest submission is authorized under Section 1.291 of Title 37 of the Code of Federal Regulations, 37 C.F.R. § 1.291.

the Thighmaster is more of a thigh and chest exerciser than a hand device. Of course Thighmaster is a derivative of the spring-coil hand exerciser and the title did include "or Similar Device." But more importantly, the title on the file wrapper is not all that the examiners had before them. The file contained documentary submissions from both parties and this Court's Opinion which describes the product's history, characteristics and uses in great detail. Faced with this array of information, the Court seriously doubts that the PTO was misled or confused.

■ Plaintiff also objects to the fact that the V–Bar was not considered as prior art and that Telebrands' experts' views were not considered. With regard to the V–Bar as prior art, it is important to keep in mind that the '827 Patent is a design patent. Although the function of the V–Bar is similar to that of the Thighmaster, none of the V–Bar's ornamental features provided the basis for the Thighmaster's infinity design.[6] As for the expert views of Ms. Erni and Ms. Badalucco, both of their views were favorably reported by this Court in the opinion submitted as part of the protest to the PTO. In sum, the Court finds plaintiff's objections to the PTO evaluation unconvincing.

■ There is, however, a more direct concern with this Court's upholding the '827 Patent. As the parties are aware, the presumption of validity for a design patent includes a presumption that the design is not functional. *See Power Control Corp. v. Hybrinetics, Inc.,* 806 F.2d 234, 240 (Fed.Cir.1986). However, this Court, in an earlier opinion, found that functionality was at least "substantially related" to the value of Thighmaster. (*See* Op. of 10/22/91 at 80 (citing *American Greetings Corp. v. Dan–Dee Imports, Inc.,* 807 F.2d 1136, 1142 (3d Cir.1986))). Is it inconsistent to now uphold the design patent? The Court determines that it is not.

■ The legal standard of functionality used to challenge trade dress rights is different from that used to challenge design patent rights. Whereas trade dress claims will be denied if the product design serves both function and aesthetics, a design patent will be invalidated only when function dictates design. As the Third Circuit has explained, courts cannot enforce trade dress rights when a product design reflects a fusion of aesthetic and ornamental characteristics:

> Proof of nonfunctionality generally requires a showing that the element of the product serves no purpose other than identification.

*Keene Corp. v. Paraflex Industries, Inc.,* 653 F.2d 822, 826 (3d Cir.1981) (quoting *SK & F Co. v. Premo Pharmaceutical Laboratories, Inc.,* 625 F.2d 1055, 1063 (3d Cir. 1980)). Applying this standard, the Court decided last October that functionality was substantially related to the product's design and, therefore, trade dress rights were absent.

■ Now, however, the Court must evaluate Thighmaster by a different standard. The level of functionality necessary to invalidate a design patent is only established "[w]hen function dictates design." *Avia Group Int'l Inc. v. L.A. Gear California Inc.,* 853 F.2d 1557, 1563 (Fed.Cir. 1988). Thus, a design patent will be upheld so long as a court agrees with the PTO that the product was not designed to serve primarily functional purposes.

■ The more rigorous standard of functionality required to defeat a design patent as opposed to a trade dress claim is reflected in the ownership term of the respective rights. An owner who can establish trade dress rights may own those rights in perpetuity provided that they continue to be used. However, the rights of a design patent owner expire after 14 years. 35 U.S.C. § 173. Therefore, the functionality necessary to invalidate a design patent constitutes an understandably more rigor-

---

**6.** The only possible aesthetic relationship between the two devices would be the inverted v-shape of the butterfly wings that appeared in Mr. Reynold's meditative state. But the Court suspects that the PTO examiner would probably exclude such visions from the realm of prior art.

ous showing than that required to defeat the trade dress right.

So, it would not be inconsistent for this Court, having found in October sufficient functionality in the Thighmaster design to deny trade dress rights, to now conclude that functionality did not *dictate* the product's design and that aesthetic concerns played a major role in the product's design. This conclusion is buttressed by the recent submissions to this Court as well as a closer examination of the product itself. Clearly, the Thighmaster infinity shape offers a mix of functional and aesthetic advantages over the prior art. To be sure, the infinity shape is a comfortable one. But its functional advantages as a multipurpose exercise device are not completely dependent on the infinity shape. As the affidavit of Jack Miller points out, alternative devices can provide for a similar workout.

While the Court has reviewed the defendant's expert submissions with care, we are not persuaded that the infinity shape is pure science. Thighmaster's inventors were not engineers. Indeed, according to Mr. Reynolds, the essence of the entrepreneurial vision was more varied and complex than a drive for pure functionality. From the perspective of design patent analysis, aesthetics were involved here. And while the inventors' creative methodology may be a bit inaccessible (if not bizarre), the ordinary observer can surely appreciate that the product's double-loop infinity shape is unique and aesthetically pleasing.

In sum, the Court finds that Ovation has demonstrated a reasonable likelihood of establishing the validity of the '827 Patent. The Court also finds, without much difficulty, that plaintiff's Thighshaper (or Thighsizer) product directly infringes on Thighmaster. As noted in the October opinion, plaintiff's product is "a direct copy of the product of the defendant varying only in the color of the sponge rubber sleeve placed over each of the elliptical spring arms and also in the color of the plastic cap that covers the spring ornament itself." (Op. of 10/22/91 at 74). Since the design patent covers the infinity shape, which has

been directly copied by Telebrands, there can be little doubt "in the eye of the ordinary observer" that plaintiff's product infringes the design patent. *Gorham Manufacturing Co. v. White*, 81 U.S. (14 Wall) 511, 527–28, 20 L.Ed. 731 (1871). The Court concludes, therefore, that defendant is likely to succeed on the merits of its claim for patent infringement.

*Irreparable Injury*

As defendant notes, irreparable harm is presumed where there exists a strong showing of patent validity and infringement. *See H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed.Cir.1987). Apart from this presumption, the Court is persuaded that Ovation's injuries are immediate and proximate. Defendant has spent substantial sums to promote the Thighmaster. The unauthorized use of Ovation's patented design will have an irreparable effect on any market share which Ovation has established or may command in the future. Such use will also encourage other companies to infringe with similar "knock-off" products and will disparage the reputation of the genuine Thighmaster product as it becomes intertwined in the consumer's mind with cheaper imitations. *See, e.g., Tri–Tech Inc. v. Engineering Dynamics*, 8 U.S.P.Q.2d 1371, 1373 (D.Mass.1988) (finding irreparable harm from a knock-off version of plaintiff's "Stair Master" exerciser); *Oscar Mayer Foods Corp. v. Sara Lee Corp.*, 15 U.S.P.Q.2d 1204, 1211 (W.D.Wis.1990) (asserted loss of retail market share that it would otherwise command is sufficient to establish irreparable harm).

Finally, it is the Court's view that the availability of monetary relief is not an adequate remedy in this case. Because the principal value of a patent is in its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole. *See Hbyritech Ind. v. Abbot Laboratories*, 849 F.2d 1446, 1456–57 (Fed.Cir.1988); *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed.Cir.1987). As the Federal Circuit explained:

While monetary relief is often the sole remedy for past infringement, it does not follow that a money award is also the sole remedy against future infringement. The patent statute ... provides injunctive relief to preserve the legal interests of the parties *against future infringement* which may have marked effects never fully compensable in money. If monetary relief were the sole relief afforded by the patent statute, then injunctions would be unnecessary and infringers could be compulsory licensees for as long as the litigation lasts.

*Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1233 (Fed.Cir.1985) (emphasis in original).

The Court sees a similar danger in the award of monetary, as opposed to injunctive, relief in this case. Based on the parties' posture thus far, protracted litigation is not unlikely. It would be contrary to the purposes of the patent statute, especially the provision specifically providing for injunctive relief, 35 U.S.C. § 283, as well as the overall purposes of preserving the status quo until a full trial on the merits, to deny defendant's request for the protection afforded under its design patent. Accordingly, this Court finds that irreparable harm is present under the circumstances of this dispute.

*Balance of Equities*

The Court has already discussed the irreparable harm which Ovation would sustain from Telebrands' continued use of Thighmaster's patented design. Of course, the relief sought by Ovation would also work some hardship on Telebrands since it would not be able to sell its exercise product during the pendency of this litigation. It should be noted, however, that Telebrands surely entered this market aware of its risks. It tried to negotiate a licensing agreement with Ovation, but when that failed, it decided to enter the market with a direct copy of Thighmaster's product. The choice was not the preferred plan, but a high-risk alternative strategy promising immediate revenues with a good chance of early retirement. The choice was premised upon a bet that a patent would not issue, or

that a court would find the product purely functional, or that Telebrands could eke out enough sales revenue to cover their investment before legal action forced them out of this business.

Such a hardship is more the regular cost of doing business in the market for "knock off" products than an inequitable imposition to be avoided by courts considering the grant of injunctive relief. As the Federal Circuit recently argued:

One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against a continuing infringement destroys the business so elected.

*Windsurfing International, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n. 12 (Fed.Cir. 1986). Telebrands' plea of hardship is diminished by the company's certain awareness of the economic risks inherent in such a legally precarious business venture. When the cost of the risk assumed is weighed against the irreparable harm of patent infringement, this Court finds that the balance of hardships tips in favor of Ovation.

*The Public Interest*

No public interest is served by allowing patent infringement. While this Court certainly favors vigorous competition in the marketplace, it also recognizes the importance of rewarding inventors for their creative genius and protecting their intellectual property rights from infringers. Rather than stifle competition, such protection encourages the innovation that leads to new products. When the validity and infringement of a patent are clear, the public interest certainly favors the protection of those products for the statutory period granted under the patent law.

CONCLUSION

In light of the foregoing, defendant's application for a preliminary injunction is hereby granted.

ORDER

Upon consideration of defendant Ovation Communications, Inc.'s ("Ovation") applica-

tion for a preliminary injunction filed January 3, 1992, all filings by the parties and the arguments of counsel,

It is on this 24th day of February, 1992, ORDERED that:

1. Plaintiff Telebrands Direct Response Corporation ("Telebrands"), its agents, employees, successors, attorneys, and all persons in active concert and participation with it, are hereby preliminarily restrained and enjoined until the trial on the merits, or until further Order of this Court, from engaging in the making, using, distribution, selling and/or offering for sale any product which incorporates the ornamental design claimed in United States Design Patent No. D322,827, including, but not limited to, Telebrands' THIGH SHAPER exercise product and any colorable imitations thereof;

2. Pending the trial of this action and pursuant to Fed.R.Civ.P. 65(c), defendant post security in a form acceptable to the Clerk of this Court in the amount of $25,-000.00, within seven days of the date of this Order.