**A.K. STAMPING CO., INC., Plaintiff,**

v.

**INSTRUMENT SPECIALTIES CO., INC. and Indravadan Patel, Defendants.**

**No. Civ.A.98–5576(JAG).**

United States District Court, D. New Jersey.

April 11, 2000.

Opinion Denying Reconsideration July 19, 2000.

---

628

Carmine A. Iannaccone, James P. Flynn, Sanford J. Hodes, Epstein, Becker & Green, P.C., Newark, NJ, for plaintiff A.K. Stamping Co., Inc.

Richard L. Plotkin, Pitney, Hardin, Kipp & Szuch, Florham Park, NJ, Regis E. Slutter, George A. Hovanec, Jr., Harold R. Brown, Burns, Doane, Swecker & Mathis, L.L.P., Alexandria, VA, for defendant Instrument Specialties Co., Inc.

Ronald L. Davison, Starr, Gern, Davison & Rubin, P.C., Roseland, NJ, for defendant Indravadan Patel.

## OPINION

GREENAWAY, District Judge.

This matter comes before the Court on plaintiff A.K. Stamping Co., Inc.'s ("AKS") motion seeking a preliminary injunction, and the cross-motion of defendant Instrument Specialties Co., Inc. ("ISC") seeking

summary judgment. AKS argues that ISC is infringing upon one of its patents and a preliminary injunction is necessary to halt that alleged infringement. ISC, in contrast, argues that AKS's patent is invalid and, in any event, it has not been infringed. For the reasons discussed below, ISC's motion for summary judgment is granted in part and denied in part and AKS's motion for a preliminary injunction is granted.

## BACKGROUND

In a Verified Amended Complaint, dated January 13, 1999, AKS alleged various breaches of federal patent law and state law by ISC.[1] AKS is a New Jersey corporation that designs and manufactures, among other things, tools and components for use in the computer, electronics, telecommunications, and medical industries. ISC is a Delaware corporation that likewise designs and manufactures products for the computer industry.

The subject matter at issue is AKS's "Card Cage Shielding Contactor" (the "Shield"), a metal implement used to reduce the distortion and disruption to personal computers caused by unwanted electromagnetic ("EMI") and radio frequency ("RFI") emissions. See Diagram A, Fig. 2 (depicting Shield and computer chassis).[2]

A computer's chassis contains a "card cage portion" with openings to receive new circuit cards.[3] A circuit card is installed by placing it within the chassis opening and securing the attached mounting bracket to the chassis. Though necessary to permit the installation of supplemental circuit cards, these openings increase the machine's susceptibility to unwanted emissions. With advancements in computer technology—particularly increases in computer speed—harmful emissions have increased as well.

The Shield was designed to minimize those negative effects, while continuing to permit easy installation of circuit cards. Previous card cage shields had proven problematic because they were insufficiently flexible and often snagged on the mounting bracket during installation and removal. In response to discussions with customers in the computer industry concerning their needs for improved shielding, AKS employees began developing the Shield.

During October 1995, AKS employee Leonard G. Meier met on several occasions with representatives of Sequent Computer ("Sequent") concerning Sequent's interest in a new "EMI gasket" that would better address the problems associated with emissions from card cage openings.[4] At a

1. This action originated one month earlier by a complaint asserting only state law causes of action. The complaint was amended to include patent infringement claims once AKS received a patent from the United States Patent and Trademark Office on the product that is the subject matter of this suit. Along with asserting claims against ISC, AKS originally alleged patent infringement and other wrongdoing on the part of Indravadan Patel, an ISC employee, formerly employed by AKS. AKS has voluntarily dismissed the entirety of its complaint against Mr. Patel, pursuant to Fed. R.Civ.P. 41(a)(1). Also pursuant to Rule 41(a)(1), AKS has withdrawn its counts of Misappropriation of Trade Secrets and Confidential, Proprietary Information (count 4), Unjust Enrichment (count 6), Breach of Contract and Breach of Duty of Loyalty (count 8), and Civil Conspiracy (count 9) against ISC. Thus, the only matters before the Court are AKS's motion for a preliminary injunction under federal patent law and ISC's motion for

summary judgment on the patent claims and the state law counts alleging unfair competition and tortious interference with contract and with prospective economic advantage. Federal jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1338(a). This Court has jurisdiction over the unfair competition claim, pursuant to 28 U.S.C. § 1338(b), and may exercise supplemental jurisdiction over the tortious interference claim, pursuant to 28 U.S.C. § 1367(a).

2. All "Diagrams" appear in the Appendix following this Opinion.

3. Through installation of additional circuit cards, the computer operator is able to augment the computer's applications.

4. From the parties' submissions, it appears that members of the industry use the term "gasket" interchangeably with "shield" or "shielding."

meeting on October 19, 1995, Meier proposed and sketched a part to meet Sequent's needs (the "October sketch") (attached here as Diagram B). The October sketch depicted a form of shield with longitudinal bands and tabs at the bottom of the Shield. "Fingers" with nearly squared-off corner breaks are struck from the bands, remaining attached to the Shield only at the base of each finger, and running longitudinally along each band and latitudinally across the bottom.

Over the course of 1995, Meier also met with representatives of Apple Computer ("Apple") to discuss Apple's card cage shielding needs. Specifically, Apple sought a highly compressible card cage shield that would minimize the potential for snagging during insertion and removal of card cage mounting brackets.

Following Meier's discussions with AKS's customers, he and James H. Bostrom of AKS discussed the design problems and concluded that altering the orientation and shape of the contact fingers would eliminate certain snagging difficulties and enhance protection from emissions. Together with Mark Andrews, Meier and Bostrom refined the idea. On November 28, 1995, Andrews completed a technical computer drawing of the product that had been discussed with Apple (the "November drawing") (attached here as Diagram C).

In January 1996, AKS completed the invention and began marketing the Shield to IBM and certain other customers. AKS continued to develop proper tooling to manufacture the Shield, and in April 1997, AKS commenced broad marketing of the Shield. On December 3, 1996, AKS filed an application for a patent on the Shield with the United States Patent and Trademark Office (the "PTO").

The alleged infringing item is ISC's Backplane Shielding, ISC product number 9510 (the "Backplane"), designed to be placed between the computer chassis and the circuit card openings to protect against EMI/RFI emissions. AKS contends that it bears all of the novel features of the Shield and infringes claims 1–4 of the '632 patent.

Prior to development of the Shield, ISC had been involved in the computer tooling business and had marketed two computer shielding products designed to reduce harmful emissions. Neither of those earlier products bore the traits of the Backplane of which AKS complains. In October 1996, in response to a customer request, ISC began developing the Backplane. Production and sales of the Backplane commenced in March 1997. AKS learned that ISC was marketing the Backplane at some point during the Summer of 1998. In August 1998, counsel for AKS notified ISC's president that the Backplane fell within certain of the claims of the pending patent, and that AKS would consider the sale and marketing of the Backplane to be infringing once the patent issued.[5]

On January 5, 1999, the PTO issued patent number 5,856,632 on the Shield (the "'632 patent") to AKS. Within days, AKS filed the amended complaint, and now has filed a motion seeking a preliminary injunction enjoining ISC from infringing the '632 patent. In addition to opposing that motion, ISC has filed a cross-motion for summary judgment.

## DISCUSSION

### I. ISC's Motion For Summary Judgment

ISC argues that it is entitled to summary judgment on AKS's patent infringement claims because the '632 patent is invalid, unenforceable and, in any event, is not infringed by the Backplane. ISC also

---

**5.** In September and October of 1998, prior to the patent's issuance, ISC requested the patent prosecution history, which AKS agreed to provide upon certain conditions. The parties were unable to agree as to the terms for the transmission of such information and it was never exchanged.

contends that it is entitled to summary judgment on AKS's unfair competition and tortious interference claims. Procedurally, this Court shall address ISC's summary judgment arguments before resolving AKS's motion seeking a preliminary injunction.

Summary judgment is appropriate under Fed.R.Civ.P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996). In making this determination, the Court must draw all reasonable inferences in favor of the non-movant. *See Hullett v. Towers, Perrin, Forster & Crosby, Inc.,* 38 F.3d 107, 111 (3d Cir.1994); *National State Bank v. Federal Reserve Bank of New York,* 979 F.2d 1579, 1581 (3d Cir.1992).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *See Jersey Cent. Power & Light Co. v. Lacey Township,* 772 F.2d 1103, 1109 (3d Cir.1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1130–31 (3d Cir.1995). "[U]nsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed.R.Civ.P. 56(e) (requiring non-moving party to "set forth specific facts showing that there is a genuine issue

for trial"). "There can be 'no genuine issue as to any material fact' where the nonmoving party's proof is deficient in meeting an essential part of the applicable legal standard, since such failure renders all other facts immaterial." *London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1537–38 (Fed.Cir.1991) (quoting *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548). In determining whether there are any issues of material fact, the court must resolve all doubts as to the existence of a material fact against the moving party and draw all reasonable inferences—including on issues of credibility—in favor of the non-moving party. *See Watts v. University of Delaware,* 622 F.2d 47, 50 (3d Cir.1980).

### A. Noninfringement[6]

■ An infringement analysis involves two steps. First, the Court construes the disputed claims in the '632 patent. Following that analysis—claim construction—the properly construed claims are compared to the allegedly infringing product. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed.Cir.1995), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Claim construction is a question of law. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir. 1996). The second step, whether the accused method or product infringes the asserted claim "is a question of fact, to be submitted to a jury." *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 384, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) (citations omitted).

### 1. Claim Construction

■ "[I]n interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution

---

**6.** Although the ultimate inquiry in this patent infringement suit asks whether AKS has proven infringement—rather than if ISC has proven noninfringement—ISC has moved for summary judgment on noninfringement grounds.

Thus, it argues that the Court can determine now, as a matter of law, that AKS will be unable to prove that ISC infringed the '632 patent. As the moving party, ISC bears the burden on this question.

history." *Vitronics*, 90 F.3d at 1582. "Extrinsic evidence may not be relied upon during claim construction when the intrinsic evidence unambiguously defines the disputed claim language." *Personalized Media Communications v. International Trade Comm'n*, 161 F.3d 696, 706 (Fed. Cir.1998). Although the court may consider "the descriptions in the . . . patent specification, the prosecution history, and relevant extrinsic evidence" if necessary to illuminate the meaning of the claim terms, "throughout the interpretation process, the focus remains on the meaning of claim language." *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed.Cir.1997); *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed.Cir.1998).

### a. *Combination of shield, chassis and bracket*

ISC urges the Court to construe the patent claims to cover a three-part assembly, combining a card cage shield, a computer chassis, and a circuit card bracket, rather than a single device, as advanced by AKS. ISC suggests that by mentioning the chassis and bracket in the claims' body and preamble, the invention includes those items. Because ISC does not design or manufacture computer chassis or circuit card brackets, it argues that it could not infringe the '632 patent, under the "combination" construction.

■ ISC's argument is illogical on its face for several reasons. First, the claims' preambles make clear that the patented invention is a "card cage shielding contactor *for being interposed* between a circuit card bracket and a computer chassis to enhance an electrical shielding connection between the circuit card bracket and the computer chassis. . . ." 5:56–59; 6:30–33 (emphasis added).[7] ISC notes correctly

that if words in the preamble are necessary to give meaning to a claim, those words may be deemed limitations of the claim. *See Gerber Garment Technology, Inc. v. Lectra Systems, Inc.*, 916 F.2d 683, 688–89 (Fed.Cir.1990). The fact that the Shield's eventual environment—between a bracket and chassis—is also referenced in the preamble does not, however, define the invention to encompass those separate parts as elements.

ISC cites *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615 (Fed.Cir.1995), to support its argument that the references to the chassis and bracket in the preamble limit the claims such that the chassis and bracket are included as elements of the invention. In *Bell Communications*, the patent-in-issue covered:

> A method for transmitting a packet over a system comprising a plurality of networks interconnected by gateways, said packet originated by a source device connected to one of said networks and destined for a destination device connected to one of said networks, said packet including a source address and a destination address

*Id.* at 618. The Federal Circuit held that the preamble's description of the packet as including source and destination addresses limited the patent to cover only methods where the transmitted packet contained those delineated features.[8]

*Bell Communications'* conclusion that the source and destination addresses were elements in that method patent does not transform any mention in a device patent of the parts with which the device will interface into components of the patent. Notably, the *Bell Communications* court did not construe the patent language to

---

7. These and similar numerical references throughout this Opinion indicate the column and line of the '632 patent at which the cited language appears.

8. A method or process comprises a different category of invention from a device, design,

or product. *See* 35 U.S.C. § 101 (1994); *Westwood Chemical, Inc. v. United States*, 207 Ct.Cl. 791, 525 F.2d 1367, 1379 (1975). A method patent covers the process by which a product is made, while a design patent covers the product itself.

cover the destination device itself. To extend *Bell Communications* as ISC urges would be inappropriate and would vitiate the very purpose of design patents. Any patent for a specific item will necessarily describe the purpose for which it has been developed. In this instance, a description of the invention's purpose requires a description of its milieu. Indeed, the fact that the preamble expressly states that the invention is a contactor "for being interposed" between the bracket and the chassis supports a finding that the claims cover a single device, and not the combination of three.

Furthermore, the specifics of each claim detail the traits of a singular device, not a combination. For example, claim 1 covers a "card cage shielding contactor comprising a relatively thin, flexible sheet of electrically conductive material having a first end, a longitudinally opposite second end, and laterally opposite side . . . ." The claim language further describes the specifics of the Shield, and *where* and *how* it interacts in the milieu into which it is placed. The fact that the invention is only effective if "juxtaposed" with a computer chassis does not mean that the invention includes the chassis. Taken to its illogical conclusion, ISC's argument suggests that no product could be protected from infringement unless it stands alone or the patentee also held patents for every item with which the new product interacts. Surely the designer and manufacturer of a high speed computer hard drive, for example, need not also produce computer chassis to be able to patent the drive—which would be utterly useless without the computer itself.[9] Indeed, under ISC's interpretation, an AKS employee could leave the company and begin producing and selling a precise copy of the AKS Shield and not be found to infringe because that individual did not also produce computers. As the plain language of the claims refutes ISC's interpretation, this Court declines to adopt it.

Additional support for construing the claims to cover a single device—the Shield—emerges from the patent specification. The first figure illustrating the claimed invention, Figure 1, depicts a side view of a mounting bracket, the Shield, and a computer chassis. *See* Diagram D. Figure 1 is described as "an exploded side elevational view *showing a card cage shielding contactor of the present invention* about to be interposed between a circuit card bracket and a computer chassis." 2:21–24 (emphasis added). If the patent examiner considered the invention to cover all three parts, this description would never have survived. *See Markman,* 52 F.3d at 979 ("Claims must be read in view of the specification, of which they are a part.").

ISC seeks further support for its combination argument in the patent's use of the definite article "the." This Court agrees with ISC that patent drafting is an art. The Court cannot, however, concur that the use of the definite article "the" within the body of the claims, subsequent to the preamble's employ of the indefinite article "a" or "an" preceding references to the computer chassis and mounting bracket, supports an interpretation that the invention covers a three-part assembly. The claims' use of the definite article simply clarifies the purpose and the placement of the Shield. It does not transform "the" computer chassis or "the" mounting bracket into components of the patented device. Indeed, if it did, the lack of *any* specific

---

9. Indeed, as AKS points out, ISC's proffered construction conflicts with ISC's patents on various products. For example, claim 7 of ISC's patent on a "Track Mounted Electromagnetic Shielding Device," U.S.Patent No. 5,001,297 (the "'297 patent"), describes the device as achieving a certain configuration "when said electromagnetic shielding device is compressed between two opposed surfaces." Flynn Cert.Ex. 28, 10:62–66. The background section of the '297 patent explains that the device is for insertion in "gaps between surfaces of doors, access panels, drawers, cabinets or the like. . . ." 1:22–24. ISC's present argument would require the patent to cover the device and the objects between which it is placed.

description of those purported elements anywhere in the claims or the patent specification would surely render the "combination patent" invalid.[10] *See generally Rowe v. Dror,* 112 F.3d 473, 478 (Fed.Cir.1997) (describing court's ability to examine patent specification to determine whether preamble recitations are "structural limitations or mere recitations of purpose").

### b. *"Relatively Thin"*

■ ISC next asks the Court to construe the term "relatively thin," which describes the thickness of the metal sheet from which the Shield is made. ISC argues that the phrase should *not* be construed to mean 0.003 inches thick—since that value is merely the preferred embodiment of the invention put forth in the patent specification. ISC urges instead that "relatively thin" should be construed to cover a range of thicknesses. AKS agrees.

This Court's review of the intrinsic evidence comports with the parties undisputed proposed construction. A thickness of 0.003 inches is mentioned only in the description of the preferred embodiment of the invention. *See* 3:16–19 ("Card cage shielding contactor is constructed of a relatively thin, flexible sheet of electrically conductive material, the preferred material being a metal, such as stainless steel having a thickness of about 0.003 inch."). The patent claims simply describe the metal as "relatively thin." Accordingly, the patent claims cover shields made of metals of a range of thicknesses.

### c. *Tip Shape and Electrical Contact*

■ Finally, ISC requests that this Court interpret the language contained in claims 1 and 2 referring to the shape of the contact fingers and the resultant enhanced electrical contact. With the portions of these claims at issue in this argument highlighted, these claims state, in pertinent part:

*Claim 1:* A card cage shielding contactor ... [with] a multiplicity of contactors ... comprising fingers struck from the sheet in a first altitudinal direction toward one of the circuit card bracket and the computer chassis, each of said fingers being in the form of a cantilever extending in a longitudinal direction from a root at the sheet to a tip spaced from the sheet in the first altitudinal direction, *the tip having a rounded profile configuration transverse to the longitudinal direction* **such that** *the contact forces move the tip of the cantilever alon[g] the longitudinal direction to establish the enhanced electrical shielding contact.*[11]

*Claim 2:* A card cage shielding contactor ... [with] a multiplicity of contactors ... comprising fingers struck from the sheet in a first altitudinal direction toward one of the circuit card bracket and the computer chassis, each of said fingers being in the form of a cantilever extending in a longitudinal direction from a root at the sheet to a tip spaced from the sheet in the first altitudinal direction, *the fingers each including a tip portion swept back in a second altitudinal direction opposite to the first altitudinal direction for enabling a wiping contact between the finger and the confronting one of the circuit card bracket and the computer chassis,* the tip having a rounded profile configuration transverse to the longitudinal di-

---

**10.** ISC also claims that the prosecution history makes clear that the invention embodies a combination of the three parts. This argument, premised on one rejection of the patent application during its prosecution history, is pure surmise and devoid of factual support—much less any undisputed factual support—and therefore cannot serve as the basis for summary judgment.

**11.** A cantilever is an arm-like projection that extends without external bracing and attached at only one end. *See* Random House Dictionary of the English Language 307 (2d ed.1987).

rection **such that** the *wiping contact is facilitated for establishing the enhanced electrical shielding contact.*

ISC argues that the phrase "such that" means that the enhanced electrical shielding results from contact between the rounded profile of the tip and either the chassis or bracket. ISC maintains that claims 1 and 2 are inconsistent, since claim 1 ostensibly covers enhanced electrical contact from the contact between the end of the rounded tip and the computer chassis or mounting bracket, while the second claim covers a device where the bent knuckle portion of the tip makes the enhanced contact. ISC argues that this interpretation is evident from the plain language in the claims. This Court disagrees.

Claim 1 plainly describes the general finger shape, with a tip that has a rounded profile configuration, and the movement of the tip along the longitudinal plane. Claim 2, by contrast, describes the specific features of the tip portion and the nature of the contact between the tip portion and the bracket or chassis. *See generally* Diagram E, Figs. 3, 4, and 8.

Claim 1 does not, as ISC suggests, state that the enhanced electrical contact results from the contact between the rounded end of the tip and either the chassis or the bracket. Rather, the claim simply states that the rounded profile configuration permits the contact forces to move the tip of the finger longitudinally to establish the enhanced shielding contact. Thus, it is the longitudinal movement (permitted by the tip shape) that establishes the enhanced contact. And, as claim 2 then explains, the tip portion is bent back in a knuckle shape that enables a wiping contact between the bent knuckle segment of the tip portion, which is facilitated by the tip shape.[12]

### 2. *Infringement Analysis*

■ The second step in the infringement analysis—whether the properly con-

strued claims are infringed by the ISC Backplane—is a question of fact. *See Pitney Bowes, Inc. v. Hewlett–Packard Co.,* 182 F.3d 1298, 1304 (Fed.Cir.1999). Although this is typically a jury question, if no genuine issues of material fact exist, summary judgment is proper. *See Zelinski v. Brunswick Corp.,* 185 F.3d 1311, 1315–16 (Fed.Cir.1999). While AKS bears the ultimate burden of proving infringement, *see id.* at 1317, the question of non-infringement is now before the Court on ISC's motion for summary judgment. Therefore, AKS need not demonstrate infringement at this juncture; ISC must show that there are no genuine issues of material fact as to whether its Backplane does not infringe the properly construed claims. Absent such a showing, summary judgment is inappropriate.

■ Patent infringement can be either literal or under the doctrine of equivalents. "To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." *Southwall Technologies, Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1575 (Fed.Cir.1995). Under the doctrine of equivalents, an accused product that does not literally infringe may still be found to infringe "if 'it performs substantially the same function in substantially the same way to obtain the same result.'" *Id.* at 1579 (quoting *Graver Tank Mfg. Co., Inc. v. Linde Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950)).

ISC first asserts that it has not infringed because it does not manufacture or import mounting brackets or computer chassis and therefore its product cannot embody every element of the '632 patent. As discussed above, ISC's proffered construction of the '632 patent is erroneous and thus ISC may not rely on it in arguing that the Backplane does not infringe AKS's patent.

---

**12.** As the differences between the first two claims and their interrelationship is apparent from the literal language of the patent, this Court need not consider any extrinsic evidence as to how those claims should be interpreted. *See Vitronics,* 90 F.3d at 1583.

ISC also argues that it has not infringed because "although the tips of the fingers of ISC's backplane shield are rounded, they make no contact with either the computer chassis or the bracket during use." ISC Summary Judgment Brief at 32. Once again, ISC's noninfringement argument depends on its erroneous proffered claim construction. Under this Court's construction, claim 1 does not require the rounded tip ends to make contact with either the computer chassis or the mounting bracket. *See* Diagram E, Fig. 8. Thus, the fact that the Backplane's tip ends do not make the contact is irrelevant to the infringement analysis.

■ Although the ultimate burden of proving infringement is on AKS, for purposes of summary judgment, ISC has not shown that there are no genuine issues as to any material facts regarding whether its product fails to embody every limitation of the '632 patent. ISC's motion for summary judgment on grounds of noninfringement must be denied, as genuine issues of material fact exist as to whether ISC has infringed the '632 patent. The question of infringement remains one for the jury.

### B. *Invalidity of the '632 Patent*

ISC argues that even if it falls short of its burden on noninfringement, summary judgment is still warranted because the '632 patent is invalid. First, ISC contends that the Shield is invalid by virtue of the on-sale bar to patentability, codified in 35 U.S.C. § 102(b) (1994). Next, ISC challenges the invalidity of the '632 patent because AKS engaged in inequitable conduct in prosecuting the patent before the PTO. Finally, ISC asserts that the '632 patent is impermissibly indefinite, in con-

travention of 35 U.S.C. § 112. The Court will address each argument in turn.

■ As an initial matter, a "patent shall be presumed valid." 35 U.S.C. § 282 (1995). The burden of establishing invalidity of a patent or any patent claim rests with the patent challenger. *See id.; see also D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1147 n. 2 (Fed.Cir. 1983). Invalidity must be proven by clear and convincing evidence. *See Oney v. Ratliff*, 182 F.3d 893, 895 (Fed.Cir.1999).[13] Summary judgment on invalidity grounds is "inappropriate if a trier of fact applying the clear and convincing standard could find for either party." *Id.*

### 1. *The "On Sale Bar"*

■ A patent is invalid if the product was offered for commercial sale more than one year before the date on which the patent application was filed. *See* 35 U.S.C. § 102(b). The date one year prior to filing the application is referred to as the "critical date."[14] The determination that a product was on sale is a question of law, to be decided by this Court based on the underlying facts. *See Tec Air, Inc. v. Denso Mfg. Mich. Inc.*, 192 F.3d 1353, 1358 (Fed.Cir.1999).

The Supreme Court recently clarified the components of this "on-sale" bar to patentability in *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). *Pfaff* made clear that an invention need not be reduced to practice to be subject to the on-sale bar. "Invention," for purposes of the patent statutes, refers to an inventor's complete concept, rather than a finished product reduced to practice. *See id.* at 66, 119 S.Ct. 304. Thus, to the extent that AKS

**13.** "Clear and convincing" falls between the "reasonable doubt" standard governing criminal cases and the "preponderance of the evidence" standard typical of civil actions. "[C]lear and convincing evidence has been described as that which produces in the mind of the trier of fact" "an abiding conviction that the truth of [the] factual contentions are 'highly probable.'" *Buildex Inc. v.Kason In-*

*dustries, Inc.*, 849 F.2d 1461, 1463 (Fed.Cir. 1988).

**14.** This term does not appear in the statute itself, but is commonly employed by both courts and practitioners. *See, e.g., Scaltech Inc. v. Retec/Tetra, L.L.C.*, 178 F.3d 1378, 1383 (Fed.Cir.1999).

suggests that because the Shield was not reduced to practice prior to the December 3, 1995 critical date it may not be barred, its arguments are unavailing.

█ *Pfaff* then set forth a two-part test for determining when the on-sale bar applies. Section 102(b) precludes the patenting of an invention if, prior to the critical date, (1) the product is the subject of a commercial offer for sale, and (2) the invention is ready for patenting. *See id.* at 67, 119 S.Ct. 304. To prevail on its argument that the '632 patent should never have issued by virtue of the on-sale bar, ISC must show by clear and convincing evidence both that there that there are no genuine issues of material fact as to 1) whether the inventors' meetings with Apple and Sequent constituted commercial offers for sale, and 2) whether the invention was ready for patenting prior to December 3, 1995. *See, e.g., Tec Air,* 192 F.3d at 1358.

### a. *Commercial offer for sale*

ISC maintains that the meetings Leonard Meier (one of the Shield's inventors) held with Apple and Sequent in the fall of 1995 constituted commercial offers for sale prior to the December 3, 1995 critical date. In support of this contention, ISC offers Meier's deposition testimony about his conversations with customers about their card cage shielding needs, his and Bostrom's development of the Shield concept in September 1995, and their proposals of the concept to certain of AKS's customers. ISC also offers Meier's call sheets, which detail his visits and discussions with customers about their needs. To refute ISC's arguments, and point to the existence of genuine issues of material fact, AKS also offers excerpts of Meier's testimony, which state that while AKS wanted to spark the customers' interest in purchasing new

shielding, the Shield was a work-in-progress during the course of these discussions, and that samples were to be provided to Apple for testing to confirm whether the Shield as it had been developed, met the customer's needs.

In *Pfaff,* the inventor of computer chip sockets provided Texas Instruments with detailed engineering drawings of his invention well in advance of the critical date.[15] Following receipt of those drawings, but still more than one year before the patent application was filed, Texas Instruments placed a written purchase order for 30,000 new sockets. Following that order, the inventor began producing the sockets in commercial quantities. *See Pfaff,* 525 U.S. at 57–58, 119 S.Ct. 304. The Court held that this constituted a commercial offer for sale subject to the on-sale bar, thereby invalidating Pfaff's patent. The fact that the invention was neither reduced to practice nor delivered to the customer until after the critical date did not alter the finding that a commercial offer had occurred. *See id.* at 60–63, 119 S.Ct. 304.

As in *Pfaff,* other cases declaring patents invalid by operation of the on-sale bar contain firm evidence of a commercial offer for sale. *See, e.g., Weatherchem Corp. v. J.L. Clark, Inc.,* 163 F.3d 1326, 1333 (Fed. Cir.1998) (affirming trial court's finding of invalidity where at least three clearly commercial transactions, including one in which "money changed hands," had occurred); *Buildex Inc. v. Kason Indus., Inc.,* 849 F.2d 1461, 1463 (Fed.Cir.1988) (invalidating patent in light of evidence of shipment of prototypes and offer and acceptance of price and quantity terms). By contrast, here, the evidence of a commercial offer presently before the Court is much less concrete—leaving open genuine issues of material fact and thus failing to satisfy ISC's weighty burden for demonstrating invalidity.

---

**15.** Of course, for purposes of the on-sale bar, it is irrelevant whether an offer for sale occurred months or minutes prior to the critical date. If at any time prior to the critical date there is a commercial offer for sale and the

invention is ready for patenting, the on-sale bar applies. *See, e.g., STX, Inc. v. Brine, Inc.,* 37 F.Supp.2d 740, 759–60 (D.Md.1999) (invalidating patent based on commercial sale offers two days before critical date).

■ Unquestionably, the evidence put forth by ISC does contain some elements of commerciality. For example, Meier's call sheets mention "quotes" to be sent to customers in connection with the Shield and, as discussed above, AKS hoped to sell the ultimate product to these customers. Nevertheless, that same evidence—and that put forth separately by AKS—speaks to non-commercial aspects of the interaction, suggesting that the product was indeed in the development or experimental stage.[16] Moreover, ISC has offered no evidence to show that the quotes mentioned in Meier's call sheets were ever sent. *Compare LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n*, 958 F.2d 1066, 1072–73 (Fed.Cir.1992) (affirming finding of non-experimental use upon evidence of transmission of price and warranty information and mailing of invoices, and without any evidence of experimentation or testing), *with Seal–Flex, Inc. v. Athletic Track and Court Constr.*, 98 F.3d 1318, 1322 (Fed.Cir.1996) (reversing summary judgment because material questions existed, including whether evaluation of product—once it had been installed and was in use at customer's facilities—was reasonably necessary).[17]

■ Thus, unlike many cases where a pre-critical-date commercial offer was found, there is no evidence before this Court of a purchase order, delivery of a sample, or any promise of future delivery. Although none of those factors is a necessary predicate to a finding of a commercial offer of sale, and no actual sale need take place, *see, e.g., Intel Corp. v. United States Int'l Trade Comm'n*, 946 F.2d 821, 830 (Fed.Cir.1991), the slim evidence of a commercial offer beyond general discussions and sketches makes it difficult for this Court, at the summary judgment stage, to declare that there are no genuine issues of fact as to whether a commercial offer of sale had occurred.[18] Since a reasonable trier of fact, applying the clear and convincing standard to the facts presently before this Court, could find for either party, summary judgment on the grounds that the Shield was offered for commercial sale prior to the critical date must be denied. *See Oney*, 182 F.3d at 895.[19]

16. Experimental use of the patented invention prior to the critical date is not subject to the on-sale bar. *See LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n*, 958 F.2d 1066, 1071 (Fed.Cir.1992).

17. AKS also points to key differences between the ultimate invention and the concept discussed with Sequent in October 1995 that gave rise to the October sketch. For example, the October sketch includes "corner breaks" at the tip of each finger (making each somewhat squared off), while the patented invention contained rounded tips, which were crucial to both its performance, and its being patented. *See* Diagram B. These distinctions raise genuine issues as to whether the device depicted in the October sketch was close enough to the patented invention to be subject to a commercial offer analysis in the first instance.

18. At oral argument, ISC's counsel suggested that informal discussion and promises to develop a part constitute an offer to sell in standard computer industry practice. Tr. Nov. 12, 1999 at 52–54. As an initial matter, ISC introduced no evidence from members of the industry to attest to such a practice. The argument of counsel cannot serve as the sole basis for a finding that the fall 1995 discussions constituted commercial offers to sell. *See Continental Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1265 (Fed.Cir.1991). Moreover, the Supreme Court's analysis in *Pfaff* suggests that standard commercial indicia of an offer of sale are the proper framework for the analysis, as opposed to industry practice. The Court is not convinced, as ISC argues, that *Robotic Vision Systems, Inc. v. View Engineering, Inc.*, 112 F.3d 1163 (Fed.Cir.1997), implies that a computer industry custom of informal discussions is the appropriate measuring stick, rather than ordinary commercial standards. Insofar as that Federal Circuit case might suggest as much, it is inconsistent with *Pfaff* and is no longer good law.

19. Since genuine issues exist as to whether there was a commercial offer for sale, this Court need not address the second question for the on-sale bar—whether the Shield was ready for patenting prior to the critical date. The *Pfaff* test is conjunctive. This second condition may be satisfied "in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the

## 2. Inequitable Conduct

■ ISC next asserts that the patent is unenforceable because AKS engaged in inequitable conduct before the PTO by failing to disclose material information. "[I]f an applicant withholds material information from the PTO with intent to affect the allowance of claims, the applicant may be found guilty of inequitable conduct and the patent obtained would be rendered unenforceable." *LaBounty*, 958 F.2d at 1070 (citations omitted). "The elements of materiality of withheld information and culpable intent must be established by clear and convincing evidence." *Id.* The Court must determine whether, considering the totality of the circumstances, "the conduct of the patentee is so culpable that its patent should not be enforced." *Id.*

■ "A patent applicant must disclose any material information to the PTO." *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1258 (Fed.Cir. 1997) (citing 37 C.F.R. § 1.56(a) (1996)).

> The starting point in determining materiality is the definition of the PTO, which recites, in part, as follows: 'information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and ... [i]t refutes, or is inconsistent with, a position the applicant takes in ... [a]sserting an argument of patentability.'

*Id.* at 1257 (quoting 37 C.F.R. 1.56(b)(2)(ii) (1996)). It is important, however, to note that "a patentee need not cite an otherwise material reference to the PTO if that reference is merely cumulative or is less material than other references already before the examiner." *Baxter Int'l, Inc. v.*

*McGaw, Inc.*, 149 F.3d 1321, 47 U.S.P.Q.2d 1225, 1229 (Fed.Cir.1998).

ISC must first make a threshold showing of intent to withhold material information before AKS need produce evidence of good faith, and before this Court will balance the materiality of the non-disclosed prior art with the evidence of intent to determine if inequitable conduct occurred. *See Nordberg, Inc. v. Telsmith, Inc.*, 82 F.3d 394, 398 (Fed.Cir.1996). "Direct proof of wrongful intent is rarely available but may be inferred from clear and convincing evidence of the surrounding circumstances." *LaBounty*, 958 F.2d at 1076. ISC contends that AKS failed to disclose on-sale activities in connection with the Shield, in derogation of its duty to the PTO. If the 1995 discussions had constituted commercial offers for sale, ISC may very well be correct. As discussed above, however, ISC has not established by clear and convincing evidence that the 1995 discussions met the standard for commercial offer for sale. Accordingly, they cannot establish by clear and convincing evidence that these discussions were material and imposed an obligation upon AKS to disclose their substance to the PTO.

■ ISC further argues that AKS withheld relevant prior art by failing to submit the October sketch with the patent application. The patent application did include the November drawing, along with extensive discussions of other prior art and attempts to differentiate the Shield from those existing products.

ISC maintains that Meier conceded that the October sketch showed "every" feature of the invention, thus demonstrating the materiality of this non-disclosed sketch.

---

critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff*, 525 U.S. at 67–68, 119 S.Ct. 304. ISC argues that the inventors' declarations in the patent application, stating that the November drawing embodied the invention, satisfy the test. AKS, however, notes that the November drawing was rejected by the patent

examiner as showing "only one of the figures of the invention and not the complete invention." Kemprowski Cert. Ex. A, Tab 8. This statement would suffice to create a material issue of fact on the second prong as well. Moreover, genuine issues of material fact exist as to whether the November drawing disclosed the invention to a sufficient degree to enable a person skilled in the art to practice it.

*See* ISC Summary Judgment Brief at 19. Upon review of. Meier's testimony, this Court finds no such concession. Meier stated that the Sequent sketch showed "the concept that the fingers go toward the static side. And it was the basic concept of what we came up with." Pavely Cert. Ex. P., Meier Dep. at 71. He also agreed that the sketch showed the fingers extending in the first and second altitudinal directions, as well as the spacing of the fingers. *See id.* Although significant components of the ultimate invention are clearly present in the sketch, Meier testified that it was drawn in a simple manner in an attempt to show the concept that was being considered. *See id.*[20]

These arguments do not satisfy ISC's burden. Even were this Court to agree that the October sketch contained all of the elements of the claimed invention— albeit in rough form—ISC has not shown by clear and convincing evidence that this preliminary sketch is not cumulative to the November drawing that was part of the PTO's record.

This Court recently granted summary judgment on the ground of inequitable conduct in *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*, 68 F.Supp.2d 494 (D.N.J.1999). In that case, the patentee had failed to disclose a twenty-year-old product offered in its sales catalog that contained similar inner workings to the subject of the patent-at-issue. As in *M. Eagles,* there is no question that the inventors here knew of this prior sketch when they declared that the patent application was complete—the October sketch was drawn by Meier. In *M. Eagles,* however, the patent focused expressly on the inner workings of the newer product and declared that none of the prior art reflected such design. *See id.* at 502. In light of that finding and the totality of the circum-

stances, this Court inferred intent to deceive. *Id.* at 503; *see also Critikon,* 120 F.3d at 1256–57 (inferring intent where patentee knew of prior art disclosing point of novelty essential to its patent prosecution).

The evidence here, by contrast, is not clear and convincing on either intent or materiality. Indeed, the fact that the November drawing was disclosed and obviously antedated the critical date, bespeaks a lack of intent to deceive. Accordingly, ISC's motion for summary judgment because of inequitable conduct is denied.

### 3. *Indefiniteness*

ISC asserts that the '632 patent is invalid because a person of ordinary skill in the art, upon reviewing its claims, specification, and prosecution history would be unable to discern what certain claims cover. Specifically, ISC contends that claims 1 and 2 employ the term "rounded" differently, resulting in two competing constructions of the shape of the Shield's contact fingers.[21] According to ISC, this inconsistent use of the same term renders the patent impermissibly indefinite.

Indefiniteness is a question of law to be determined by the Court. *See Personalized Media Communications, LLC v. International Trade Comm'n,* 161 F.3d 696, 705 (Fed.Cir.1998). The second paragraph of 35 U.S.C. § 112 provides: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." To determine whether a patent claim comports with the statute's mandate, this Court must analyze "whether one skilled in the art would understand the bounds of the claim when read in light of

---

**20.** As noted earlier, the finger shape in the October sketch differed significantly from that employed (and claimed) in the patented Shield. This weighs against finding that the October sketch disclosed the claimed invention.

**21.** The relevant language in these claims is set forth in Section I(A)(1)(c), *supra.*

the specification.... If the claims read in light of the specification reasonably apprise those skilled in the art of the scope of the invention, § 112 demands no more." *Personalized Media,* 161 F.3d at 705 (original ellipsis) (citation omitted).

ISC contends that the language in claims 1 and 2 clouds whether the "rounded tips" are "shaped like the tip of a normal human finger" or "like a finger bent at the knuckle." But, ISC argues, in prosecuting its patent application, AKS distinguished its claims from the prior art on the ground that the tips are rounded along their lengths and curved like a knuckle.[22] ISC's contention that these phrases are inconsistent, thereby invalidating the patent on indefiniteness grounds, is unpersuasive.

It is clear upon reading the literal language of these claims that claim 1 describes the overall shape of the contact fingers—including the shape of their tips, while claim two details the particulars of the tip *portion* of each of those fingers. This interpretation is supported by reference to the technical drawings included in the patent. *See* Diagram E, Figs. 3, 4. Figure 3 offers an aerial view of a band on the Shield with its cantilever fingers. The fingers are struck from the metal sheet with rounded ends, which comports with the language of claim 1. Figure 4, however, provides a side profile of the band, and a detailed examination of the shape of the sweep back contained in the tip portion. This figure is consistent with claim 2's description of the shape of the tip portion, which improves the wiping contact. There is no inconsistency, and thus no indefiniteness on that basis.

Moreover, ISC's suggested construction of the contact finger design would render claim 2 superfluous. If the rounded end of the tip portion made contact, any description of the sweep back to facilitate the wiping contact would be meaningless. Mindful of a patent's presumed validity, and the Federal Circuit's admonition that when patent claims are amenable to more than one construction, they should be interpreted, when reasonably possible, to preserve their validity, *see Modine,* 75 F.3d 1545, 1557 (Fed.Cir.1996), this Court is reluctant to accept ISC's interpretation.

As noted above, the "decision as to whether a claim is invalid under this provision requires a determination whether those skilled in the art would understand what is claimed." *Amgen, Inc. v. Chugai Pharmaceutical Co., Ltd.,* 927 F.2d 1200, 1217 (Fed.Cir.1991); *see also Personalized Media,* 161 F.3d at 705. ISC has offered no evidence that the Court may properly consider in this context—deposition testimony or affidavits or expert opinion—that suggests that someone skilled in the art could not understand this invention sufficiently to be able to practice it because of the allegedly indefinite language. As the arguments of counsel alone cannot constitute clear and convincing evidence of indefiniteness, ISC has failed to meet its burden.

Indeed, even if ISC's argument did satisfy its initial burden on summary judgment and pointed to the non-existence of a material fact on this issue, AKS has responded with substantial evidence that could lead a trier of fact to conclude differently. For example, AKS has offered the testimony of three engineers who compared the claims of the '632 patent with the traits of ISC's allegedly infringing Backplane. *See* AKS Preliminary Injunction Brief at 17–20 (citing Patel Dep. at 95–98, Federici Dep. at 73–78, and McFadden Dep. at 81–85, 157–59, 161–62). AKS argues that their ability to comprehend the language of those claims defeats ISC's indefiniteness theory. AKS also disputes

---

**22.** AKS concedes that, as a result of a typographical error in Figure 3 of the drawings that accompanied the patent application, that figure omitted reference number 76 to correspond to the claims' description of the rounded tips. AKS has represented that it is currently correcting that error with the PTO—and the Court will not ascribe any motivation or significance to the omission of that reference number.

ISC's characterization of the patent prosecution, arguing that the shape of the finger tip was not the sole distinction from the prior art. For all of these reasons, ISC has not met its burden, and its motion for summary judgment on grounds of indefiniteness must be denied.

## C. Dependent Infringement

AKS has also asserted claims against ISC for contributory infringement and inducing infringement. Neither ISC, in moving for summary judgment on these claims, nor AKS in opposing it cited a single authority governing the standard for finding induced or contributory infringement, or the facts to support (or refute) these claims.[23] At oral argument, however, both parties agreed that there are no disputed material issues of fact on these claims and thus summary judgment is appropriate. Tr. Nov. 12, 1999 at 71–72.

■ Along with prohibiting direct infringement, the patent statute also imposes liability for induced and contributory infringement—so-called "dependent infringement." *See Joy Technologies, Inc. v. Flakt, Inc.,* 6 F.3d 770, 774 (Fed.Cir.1993). There may be no dependent infringement without first finding actual infringement. *See id.* Both contributory infringement and induced infringement also require the involvement of a third party. *See Joy Technologies,* 6 F.3d at 775.

### 1. Contributory Infringement

Under 35 U.S.C. § 271(c),

[w]hoever offers to sell or sells ... a component of a patented machine, manufacture, combination or composition ... constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

According to AKS's statements at oral argument, its contributory infringement argument relates to ISC's "combination" patent theory. Were the Court to accept that interpretation, AKS maintains that ISC's sale of the Backplane would contribute to direct infringement by the purchaser who would practice the "combination invention" of the bracket, chassis, and Backplane shield.

Since this Court has found the '632 patent to cover only a single device, there is no genuine issue of material fact as to whether ISC's sale of the Backplane contributes to the direct infringement of the patent by a third party.[24] *Compare Serrano v. Telular Corp.,* 111 F.3d 1578, 1583–84 (Fed.Cir.1997) (finding contributory infringement where accused device in combination with a second device contained all the limitations of the asserted claim). Accordingly, ISC's motion for summary judgment on Count II is granted.

### 2. Inducing Infringement

■ AKS also alleges that ISC induced infringement of the '632 patent, prohibited by 35 U.S.C. § 271(b) ("Whoever actively induces infringement of a patent shall be liable as an infringer.").[25] Like contributory infringement, inducing infringement requires a finding first of direct infringement, and then that the defendant knowingly induced that infringement. *See Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 553 (Fed.

**23.** This Court, nevertheless, will consider ISC's motion.

**24.** As AKS has put forth no evidence to support a finding that ISC has contributed to another's direct infringement of the properly construed claims of the '632 patent, this Court will not explore the knowledge required before liability for contributory infringement may be imposed.

**25.** This claim was originally asserted against defendant Patel as well. At oral argument, counsel for AKS maintained that the dismissal of all claims against defendant Patel did not impact this claim.

Cir.1990). As this Court has rejected ISC's noninfringement arguments, and whether direct infringement occurred is a question for the jury, any grant of summary judgment would be premised of necessity on a finding that AKS cannot satisfy the second prong as a matter of law.

To meet this standard, AKS must establish that ISC

> possessed specific intent to encourage another's infringement and not merely that the defendant had knowledge of the acts alleged to constitute inducement. The plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements.

*Id.*

AKS appears to argue that by selling the Backplane to ISC customers, ISC induced the customers' infringement of the '632 patent. In its preliminary injunction papers, AKS submitted the certification of Mark Andrews, relaying a hearsay account of a conversation between an IBM employee, Walter Goodman, and an ISC representative concerning the sample ISC Backplane provided to Goodman. According to Andrews, Goodman inquired as to whether the Backplane implicated any proprietary, interests of AKS and was assured that it did not. Andrews Cert. ¶ 7.

■■■ AKS has offered no evidence of the date on which the alleged conversation between Goodman and the ISC representative transpired. To sustain an inducing infringement claim, the acts of inducement must follow the issuance of the patent. *See National Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1196 (Fed.Cir. 1996) (no induced infringement where inducement occurred before patent existed).

If there is no patent to infringe, any "inducement" is not wrongful, and may not serve as the basis for liability under § 271(b). *See National Presto*, 76 F.3d at 1196.[26]

■■■ AKS appears to concede that this conversation occurred *before* the patent issued. *See* AKS Opposition Brief at 32 (criticizing ISC's representative's alleged representations to Goodman for having been made "despite knowledge of the pending patent application" and arguing that "these misrepresentations led directly to sales to IBM by ISC ... in mid-December 1998").[27] As such, these statements cannot serve as a basis for an inducement claim. Indeed, even if the alleged conversation between Goodman and the ISC representative transpired sometime following the issuance of the '632 patent on January 5, 1999, a lone hearsay reference to a single conversation between an unnamed ISC representative and one of his customers (also an AKS customer) is wholly insufficient to create a genuine issue of material fact as to whether ISC knowingly induced direct infringement. Accordingly, ISC's motion for summary judgment on Count III, inducing infringement, is granted.

### D. State Law Claims

Finally, ISC has moved for summary judgment on AKS's state law claims for unfair competition and tortious interference with contract and with prospective economic advantage. AKS's unfair competition and tortious interference claims were originally premised on alleged misappropriation of trade secrets. In withdrawing those trade secret allegations, AKS recharacterized its unfair competition and tortious interference counts as being premised on ISC's "wrongful and tortious

---

**26.** There is no suggestion that ISC did not begin marketing its Backplane until after the issuance of the '632 patent. AKS has introduced evidence documenting sales of the Backplane throughout 1998, including sales to IBM beginning in December 1998. *See* Flynn Cert. Ex. 9.

**27.** The Andrews certification, dated January 25, 1999, also contains no date as to when the conversation between Andrews and Goodman occurred, noting cryptically that it took place "recently."

act" in allegedly infringing the '632 patent, and ISC's unfair behavior in its interaction with IBM and ISC's advertising for the Backplane.

## 1. *Unfair Competition*

█ ISC argues that as now portrayed, AKS's state law claims are preempted by patent law since the basis for any liability on these claims would be patent infringement. Although 28 U.S.C. § 1338(b) provides federal courts with jurisdiction over state law unfair competition claims joined in federal infringement actions, those state law claims must be based on acts beyond simply patent infringement. *See Mars Inc. v. Kabushiki–Kaisha Nippon Conlux*, 24 F.3d 1368, 1373 (Fed.Cir.1994) ("infringement of patent rights ... is not generally recognized as coming within the rubric of 'unfair competition' "); *see also Rodime PLC v. Seagate Technology, Inc.*, 174 F.3d 1294, 1306 (Fed.Cir.1999) ("[t]he patent laws will not preempt such claims if they include additional elements not found in the federal patent law cause of action"), *cert. denied*, — U.S. ——, 120 S.Ct. 933, 145 L.Ed.2d 812 (2000).

AKS concedes that it must demonstrate conduct distinct from the infringement to sustain its state law claims. AKS argues that ISC's "direct targeting" of an AKS customer (IBM) and ISC's representative's comments to IBM despite knowledge of AKS's pending patent application, along with ISC's advertising of the Backplane, defeat summary judgment on its state tort claims.[28]

█ To prove unfair competition under New Jersey law under a passing off theory, AKS must show that ISC "passed" or "palmed" off AKS's Shield as ISC's product. *See, e.g., New Jersey Optometric Ass'n v. Hillman–Kohan Eyeglasses, Inc.*, 144 N.J.Super. 411, 427–28, 365 A.2d 956 (Ch.Div.1976), *aff'd*, 160 N.J.Super. 81, 388 A.2d 1299 (App.Div.1978); *Hoffman–La Roche Inc. v. Genpharm Inc.*, 50 F.Supp.2d 367, 380 (D.N.J.1999). AKS has not introduced a scintilla of evidence that ISC offered AKS's Shield to any potential customer as ISC's own product, or that there was a likelihood of confusion that ISC's Backplane would be perceived by the public as AKS's Shield. *See Eli Lilly*, 23 F.Supp.2d at 494–95.[29] To the contrary, one of AKS's primary complaints

**28.** ISC has suggested that the law of either New Jersey or Pennsylvania might control these claims, since AKS is a New Jersey corporation, and the ISC meeting with IBM occurred in Pennsylvania. This Court, when exercising jurisdiction over state law claims, applies New Jersey's choice of law principles in deciding which state's substantive law will govern the dispute. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New Jersey follows the "governmental interest" approach to tort actions. *See Pfau v. Trent Aluminum Co.*, 55 N.J. 511, 514–15, 263 A.2d 129 (1970). Under New Jersey conflict of laws rules, however, there is no need to conduct that analysis if the Court is only faced with a false conflict—that is, the result would be identical in either state. *See id.* at 525, 263 A.2d 129. On the tortious interference claim, New Jersey and Pennsylvania law are virtually identical. *Compare C.R. Bard, Inc. v. Wordtronics Corp.*, 235 N.J.Super. 168, 171–72, 561 A.2d 694 (1989) *with Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d

466, 471 (1979). Thus, as the parties appear to agree, New Jersey law will govern. Although New Jersey and Pennsylvania law on unfair competition appear to differ slightly in that New Jersey's standard encompasses another tort, the outcome would be the same under either approach. Thus there is another false conflict and New Jersey law will apply. *Compare Eli Lilly & Co. v. Roussel Corp.*, 23 F.Supp.2d 460, 494 (D.N.J.1998) (unfair competition under New Jersey law encompasses "passing off" and unprivileged imitation), *with Pennsylvania State University v. University Orthopedics, Ltd.*, 706 A.2d 863, 871–72 (1998) (unfair competition under Pennsylvania law may be established by proof of confusion or likelihood of confusion under "passing off" theory).

**29.** ISC suggests that AKS must now amend its Complaint to reflect the new factual basis for its state law claims. As summary judgment against AKS would be warranted even if those claims were properly plead, no amendment is necessary.

is that ISC wrongly differentiated its product from the AKS Shield in conversations with IBM.

■■■ Unfair competition under New Jersey law also encompasses unprivileged imitation. To satisfy this standard, AKS must first show that ISC's Backplane copied or imitated the physical appearance of the Shield and that the copied or imitated feature had acquired a special significance identifying it as AKS's product. *See Eli Lilly,* 23 F.Supp.2d at 495. AKS must also demonstrate that:

> (i) the copy or imitation is likely to cause prospective purchasers to regard his goods as those of the other, and (ii) the copied or imitated feature is non-functional, or, if it is functional, he does not take reasonable steps to inform prospective purchasers that the goods which he markets are not those of the other.

*SK&F, Co. v. Premo Pharmaceutical Laboratories Inc.,* 625 F.2d 1055, 1062–63 (3d Cir.1980). Aside from the fact that the Shield was ultimately patented—which may not be the sole basis for the state law claims in this patent action—AKS has offered no evidence to show that the Shield, or any of its features, had acquired special significance in the marketplace, as distinctly identified with AKS. Nor has AKS demonstrated that the Backplane is likely to be perceived as an AKS product in the market, or that ISC does not take reasonable steps to inform customers that the Backplane is an ISC product, rather than an AKS Shield. In sum, AKS appears not to have discovered any facts independent of alleged infringement to support these state law claims. Because AKS cannot avoid preemption and, in any event, has not in-troduced evidence to satisfy the prerequisites of an unfair competition claim, there are no genuine issues of material fact to preclude summary judgment. Therefore, ISC's motion for summary judgment on Count V is granted.

> **2. *Tortious Interference with Contract and with Prospective Economic Advantage***

AKS's remaining state law claim, tortious interference, also was originally premised on a misappropriation of trade secrets theory. AKS claimed initially that ISC allegedly interfered with AKS's contract with Indravadan Patel. *See* Am.Cplt. ¶ 167.[30] As described above, AKS now argues that ISC's conduct in marketing its product to IBM, which was an AKS customer, and the representations made directly to IBM and generally in ISC sales literature constituted tortious interference.

■■■ As with AKS's unfair competition claim, its tortious interference claim is not preempted if it is based on more than patent infringement alone. *See Rodime,* 174 F.3d at 1306. Under New Jersey law, one may intentionally prevent a third person from entering a prospective contractual relation with a competitor if:

> (a) the relation concerns a matter involved in the competition between the actor and the other and (b) the actor does not employ wrongful means and (c) his action does not create or continue an unlawful restraint of trade and (d) his purpose is at least in part to advance his interest in competing with the other.

*C.R. Bard, Inc. v. Wordtronics Corp.,* 235 N.J.Super. 168, 172, 561 A.2d 694 (1989) (quoting *Restatement (Second) of Torts* § 768).[31] Thus, even if ISC did intention-

---

**30.** As described in note 1, *supra,* AKS has withdrawn all of its allegations related to Patel.

**31.** In cases in which the patentee was charged with tortious interference stemming from its publicizing its patent in the market-place, the Federal Circuit has imposed a "bad faith" requirement in order for the state law claim to avoid federal preemption. *See, e.g., Zenith Electronics Corp. v. Exec, Inc.,* 182 F.3d 1340, 1355 (Fed.Cir.1999). As the tortious interference allegations here are cut from a different cloth, this Court will not extend that bad faith requirement.

ally cause AKS's customers not to contract with AKS, if ISC compiled with the four factors set forth in *C.R. Bard,* its behavior was permissible. AKS's bases for its tortious interference claim are ISC's advertising and the IBM conversation. As such, the *C.R. Bard* factors are not met. Such vague and conclusory allegations fail to raise a genuine issue of material fact as to whether ISC's behavior was indeed wrongful. Accordingly, ISC's motion for summary judgment on Count VII is granted.

## II. *AKS's Motion for a Preliminary Injunction*

AKS has moved this Court for a preliminary injunction, prohibiting ISC from marketing the Backplane. Having survived ISC's summary judgment motion on the patent infringement claim, AKS must satisfy the standard for a preliminary injunction before such relief may be obtained.

 Under 35 U.S.C. § 283, this Court may grant injunctive relief to prevent the violation of any right secured by the patent. In addressing AKS's motion for a preliminary injunction, the Court must consider: (1) whether AKS has shown a reasonable probability of success on the merits, (2) whether AKS will be irreparably injured by denial of relief, (3) the extent to which granting preliminary relief will result in even greater harm to the nonmoving party, and (4) whether granting preliminary relief is in the public interest. *See Council of Alternative Political Parties v. Hooks,* 121 F.3d 876, 879 (3d Cir.1997); *see also Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.,* 40 F.3d 1431, 1438 (3d Cir.1994).[32] All four factors must be considered before an injunction may

issue. *See Polymer Technologies, Inc. v. Bridwell,* 103 F.3d 970, 973 (Fed.Cir.1996).

### A. *Likelihood of Success on the Merits*

To obtain preliminary injunctive relief, AKS must show, in light of the burdens in place at trial, that it is likely to prove that the '632 patent is valid and that it is infringed by the Backplane, and that it will withstand ISC's allegations of patent invalidity and unenforceability. *See Genentech, Inc. v. Novo Nordisk A/S,* 108 F.3d 1361, 1364 (Fed.Cir.1997).

### 1. *Validity*

 Although 35 U.S.C. § 282 accords a patent holder a presumption of validity, at the preliminary injunction stage, due to the extraordinary nature of the desired relief, AKS bears the burden of showing it is likely to refute ISC's charges of invalidity. *See Nutrition 21 v. United States,* 930 F.2d 867, 869 (Fed.Cir.1991). AKS need not prove validity—in light of the presumption of validity, that burden always rests with the patent challenger. *See Canon Computer Sys., Inc. v. Nu–Kote Int'l, Inc.,* 134 F.3d 1085, 1088 (Fed.Cir.1998). AKS must demonstrate, however, that it is likely to show at trial that ISC has not offered persuasive evidence of invalidity. *See id.* ("where the challenger fails to identify any persuasive evidence of invalidity, the very existence of the patent satisfies the patentee's burden on the validity issue"); *New England Braiding Co. v. A.W. Chesterton Co.,* 970 F.2d 878, 883 (Fed.Cir. 1992) (noting that patentee at preliminary injunction phase "must show that the alleged infringer's defense lacks substantial merit").

*Compare id.* at 894–95 (applying Ninth Circuit preliminary injunction requirements), *with Hybritech Inc. v. Abbott Labs.,* 849 F.2d 1446, 1451, 1451 n. 12 (Fed.Cir.1988) (applying Federal Circuit test). This Court need not resolve this issue since the Federal Circuit preliminary injunction standard is identical to that employed by the Third Circuit. *See id.* at 1451.

---

**32.** Although the law of the Federal Circuit governs all substantive considerations in patent cases, purely procedural matters that are not unique to patent law are governed by the law of the regional circuit. *See Mikohn Gaming Corp. v. Acres Gaming, Inc.,* 165 F.3d 891, 894 (Fed.Cir.1998). The case law is somewhat unclear as to whether the controlling criteria for the grant of preliminary injunctive relief are a matter of procedure or substance.

### a. On Sale Bar

■ Relying on its arguments in support of its summary judgment motion, ISC asserts that the patent is invalid by virtue of the on-sale bar.[33] Upon reviewing the evidence presented by both parties, this Court concludes that AKS has met its burden and demonstrated that ISC has not pointed to substantial evidence that the discussions with either Sequent or Apple constituted a commercial offer for sale. Accordingly, the on-sale bar is not a basis for denying the preliminary injunction.[34]

### b. Pre-critical date sales

■ Patents may only issue on novel inventions. See 35 U.S.C. § 101 (1994). Thus, a patent is invalid "when the same device or method, having all of the elements and limitations contained in the claims, is described in a single prior art reference." ATD Corp. v. Lydall, Inc., 159 F.3d 534, 545 (Fed.Cir.1998). In opposition to AKS's preliminary injunction motion, ISC relays a hearsay account that several gaskets bearing all of the pertinent features of the claims in the '632 patent were made for, and sold to, IBM in the early 1990s. The pre-critical date development and sale of these alleged equivalent devices, according to ISC, raises a substantial question about the novelty of the Shield, and, consequently, about the '632 patent's validity.

This argument, devoid of support beyond counsel's argument, is untenable. ISC did not produce any documents connected to this alleged prior art during the course of discovery and should not be allowed to rely on this withheld material in arguing invalidity. See Schwarzkopf Tech-

nologies Corp. v. Ingersoll Cutting Tool Co., 142 F.R.D. 420, 422 (D.Del.1992) (requiring defendant to identify all prior art underlying its affirmative defenses); ATD Corp., 159 F.3d at 550–51 (affirming trial court's exercise of discretion to exclude use of prior art not produced during discovery). In connection with this motion, ISC, in its brief, presents a lone, unattributed drawing of one such alleged device.[35] This drawing utterly fails to raise a substantial question of invalidity, because the evidence is not presented in a form, or with the proper authentication, that this Court needs to evaluate this issue. In light of that, and mindful that the presumption of a patent's validity applies at all stages of litigation, see Canon, 134 F.3d at 1088, this Court will not credit an argument rooted in unsubstantiated hearsay to have "substantial merit" about invalidity.

### c. Best Mode

A patent specification must "set forth the best mode contemplated by the inventor for carrying out his invention." 35 U.S.C. § 112 ¶ 1 (1994). ISC contends that the '632 patent fails to disclose the best mode for carrying out the Shield and therefore is invalid.

To determine whether AKS satisfied the best mode requirement, the Court must consider two factors. The first inquiry is subjective, and contemplates whether, "at the time the patent application was filed, the inventor knew of a mode of practicing the claimed invention that he considered to be better than any other." Young Dental Mfg. Co. v. Q3 Special Prods., Inc., 112 F.3d 1137, 1144 (Fed.Cir.1997). If a preferred mode did exist at the time of filing, the Court must then determine, under an

**33.** See discussion, Part I(B)(1) supra.

**34.** Because there has been no substantial question of on-sale activities, ISC's argument that AKS engaged in inequitable conduct by withholding evidence of alleged offers for commercial sale fails as well.

**35.** ISC acknowledges the unusual nature of its "evidence", but asks the Court to rely on

hearsay so that ISC may avoid issuing a subpoena to its customer, IBM, to obtain documents concerning the alleged prior art. While this Court recognizes the dilemma ISC faces, ISC may not use it as both a sword and a shield: its failure to provide the documents thus fully precludes the Court from considering this defense.

essentially objective test, whether the "specification adequately disclosed what the inventor contemplated as the best mode so that those having ordinary skill in the art could practice it." *Id.*

ISC alleges that the tooling AKS developed for producing the Shield is the best mode for practicing the invention claimed in the '632 patent. During discovery, AKS claimed that the details of that tooling constituted protected trade secrets and refused to reveal that information. *See, e.g.,* Pavely Cert. Ex. Q, Andrews Dep. at 271–73. ISC argues that this nondisclosure violated AKS's obligation and thereby invalidates the patent.

■■■ This Court's consideration of the best mode argument begins and ends with the first prong of the inquiry. In support of its challenge, ISC points to the deposition testimony of Mark Andrews, one of the named inventors of the patent. During his deposition, Andrews declared that the tooling used by AKS is the best mechanism for manufacturing the invention, and that the techniques it employs are not included in the patent specification. *See* Pavely Cert. Ex. Q, Andrews Dep. at 288–92. Earlier in his testimony, however, Andrews stated expressly that the tooling was not developed until January 1997 at the earliest—at least one month *after* the patent application was filed in December 1996. *See* Andrews Supp. Cert. Ex. B at 201, 222–23. Since the alleged best mode was not designed until after the filing of the application, and ISC has pointed to no evidence to indicate that Andrews or any other inventor knew of that tooling prior to the application, it has not raised substantial questions about whether AKS withheld the best mode for practicing the '632 patent.

**36.** This Court has already disposed of ISC's argument that the "rounded tip" language in claims 1 and 2 results in two inconsistent constructions. Although ISC need not present the clear and convincing evidence necessary to obtain summary judgment in order to

#### d. *Undefined, relative terms*

■■■ ISC argues that the '632 patent includes the word "enhanced" as an undefined, relative term, which renders the patent invalid for indefiniteness.[36] Claims 1 and 2 open by defining the invention as a "card cage shielding contactor for being interposed between a circuit card bracket and a computer chassis *to enhance* an electrical shielding connection between the circuit card bracket and the computer chassis when the card is juxtaposed with the computer chassis." 5:56–60; 6:30–35 (emphasis added). Claim 1 concludes by describing the configuration of the tip of the contact finger as "such that the contact forces move the tip of the cantilever alon[g] the longitudinal direction *to establish the enhanced electrical shielding contact.*" 6:25–29 (emphasis added). Claim 2 concludes by describing the sweep back of the tip portion "such that the wiping contact is facilitated *for establishing the enhanced electrical shielding contact.*" 7:5–8 (emphasis added).

ISC contends that the claims leave the reader unclear as to what is enhanced. ISC maintains that "enhanced" is a vague term of degree for which the patent statute requires greater explanation. *See* 35 U.S.C. § 112 ¶ 2 ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."). From the opening lines of the claims, however, it is apparent that the electrical shielding connection is enhanced when the Shield is placed between the circuit card bracket and the computer chassis. That is, placing the Shield into position enhances the electrical shielding connection relative to the shielding connection when the Shield is not in position. In light of this clear language, the patent specification need

defeat the grant of preliminary injunctive relief, the Court has construed that claim language differently from the interpretation advanced by ISC. Thus, under any burden of proof, ISC's rounded tip argument will not succeed.

not separately define the term "enhanced." [37] As the term "enhanced" does not render the patent impermissibly vague or indefinite, AKS has met its burden and shown it is likely to defeat this invalidity argument.

### e. Improperly named inventor

ISC alleges that the '632 patent is invalid because Mark Andrews was falsely named as an inventor of the Shield. According to ISC, Meier, and Bostrom to a lesser extent, were the true inventors, while Andrews' involvement was something of an afterthought—merely to help reduce the part to practice.

A patent is invalid if the patentee "did not himself invent the subject matter sought to be patented." 35 U.S.C. § 102(f) (1994). The inventors named in a patent are presumed correct. *See Canon*, 134 F.3d at 1088. "Inventors may apply for a patent jointly even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent." 35 U.S.C. § 116 (1994). But, "each joint inventor must generally contribute to the conception of the invention." *Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1460 (Fed.Cir.), *cert. denied*, 525 U.S. 923, 119 S.Ct. 278, 142 L.Ed.2d 229 (1998). Thus, the fact that the bulk of the Shield may have been Meier's creation does not preclude the naming of others involved to a lesser degree, provided they were involved in the Shield's conception.

■■■ "A contribution to one claim is enough." *Id.* Andrews testified that he worked with the drawings and refined the Shield's design and reduced it to a form that could be manufactured. *See* Pavely Cert. Ex. Q, Andrews Dep. at 139–40. He further testified to his involvement in developing the patented finger shape and size, finger sweep back, retention clips, and the thickness, and flexibility of the Shield, both of which are claimed elements *See generally* Andrews Supp. Cert. Ex. B, Andrews Dep. at 177–83, 272–74, 425–27. ISC has not raised a substantial question that Andrews' efforts were something a person of ordinary skill could have accomplished. *See Ethicon*, 135 F.3d at 1460 (noting that "conception" is complete when person of ordinary skill in the art would be able to reduce the invention to practice).

ISC has pointed to an excerpt of Meier's testimony in which he stated that Andrews had little to do with the "idea" of the part and that he and Andrews did not "directly interface." Pavely Cert. Ex. P, Meier Dep. at 34. While that testimony lends credence to ISC's assertion that Andrews' contribution did not merit "inventorship," that alone is not dispositive. If, in good faith, an inventor is improperly named, the application may be amended and the patent will remain valid. *See* 35 U.S.C. § 116; *see also Canon*, 134 F.3d at 1089 ("Incorrect inventorship is a technical defect in a patent that may be easily curable."). In response to ISC's accusation of impropriety, Andrews submitted a certification, attesting to his good faith belief that he was a proper joint inventor of the Shield. *See generally* Andrews Supp. Cert. This Court will not infer, and has no reasonable basis to infer, that Andrews perjured himself both in swearing to his declaration as part of the patent application and in his Certification to this Court. More important ISC has pointed to no facts evincing deceptive intent on the part of Andrews or any other person. ISC's

---

37. As noted in Part I(B)(3), *supra,* a court investigating a charge of indefiniteness must consider "whether one skilled in the art would understand the bounds of the claim when read in light of the specification." *Personalized Media Communications, LLC v. International Trade Comm'n*, 161 F.3d 696, 705 (Fed.Cir.1998). The clarity of the language at issue here obviates any need to consider extrinsic evidence, and this Court has not relied on post-patent deposition testimony of the inventors about their interpretation of the patent language.

failure to raise a substantial question must defeat its charge of patent invalidity on this ground.[38]

### 2. *Infringement*

■ In order to obtain a preliminary injunction, AKS must further show that it is likely to prove infringement by ISC. As the patent holder, AKS bears the burden of proving infringement. *See Under Sea Indus., Inc. v. Dacor Corp.*, 833 F.2d 1551, 1557 (Fed.Cir.1987).

As noted in Part I(A)(2) above, patent infringement can be literal, or by the doctrine of equivalents. AKS argues that ISC's Backplane infringes the first four claims of the six-claim '632 patent under either analysis. Whether the properly construed claims of the '632 patent "read on" the Backplane is a question of fact. *See Pitney Bowes*, 182 F.3d at 1304 (Fed. Cir.1999).[39]

As an initial matter, with respect to claim 2 only, AKS asserts that ISC has conceded infringement. Relying on its erroneous proposed construction of the "rounded tip" and "tip portion" language, ISC admitted that the tips of the Backplane contact fingers are rounded, but declared that there could be no infringement because in the Backplane, "electrical shielding contact is made between the curved 'knuckle' or tip portion' of the fingers and the chassis or bracket in the manner illustrated in Fig. 8 of the '632

patent, not with the 'tip' of the fingers." ISC Summary Judgment Brief at 32. ISC's protestations notwithstanding, that admission and an examination of the Backplane demonstrate that it embodies precisely the proper construction of claim 2: a shield bearing contact fingers with rounded tip ends, which tips are bent back to form a knuckle-like portion that makes contact with the chassis or bracket. *See* Parts I(A)(1)(a) and (2), *supra.* AKS has thus demonstrated that it is likely to prove infringement of claim 2.

In support of its infringement argument, AKS has submitted a claim chart citing testimony comparing the ISC Backplane to the claims 1–3 of the '632 patent.[40] The testimony comes from three individuals skilled in the art, and not employed by AKS: Jeffrey McFadden, the Director of Engineering & Technical Services at ISC; Indravadan Patel; and, Dominic Federici.[41] At their depositions, these individuals were questioned as to whether the '632 patent's claims' limitations are present in the Backplane. Stringing together various segments of their testimony, AKS's claim chart indicates that the Backplane reads on every limitation of claims 1–3 of the '632 patent.

ISC's primary defense against infringement depends on its proffered three-part assembly claim construction, which this Court has rejected. As a fall-back position, ISC disputes the viability of the testi-

---

**38.** The Court need not determine whether, in fact, Andrews was named properly. It suffices at this point to determine that AKS has shown that it will likely defeat an invalidity challenge based on improper inventorship.

**39.** A properly construed patent claim "reads on" an accused infringing device "when every limitation recited in the claim is found in the accused device." *Amhil Enterprises Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1562 (Fed.Cir. 1996).

**40.** Plaintiff's claim chart offers no comparison with respect to claim 4, a dependent claim of claim 3. *See* 7:12–18; AKS Preliminary Injunction Brief at 17–20. Although the omission may have been an oversight, AKS

has failed to put forth any evidence indicating infringement of the independent limitations in that claim, and consequently, has not shown that it is likely to succeed on the merits of proving infringement of claim 4. The failure to carry its burden on claim 4 does not detract from the showing AKS has made on the first three claims and is not an independent basis for considering denial of the application for a preliminary injunction.

**41.** AKS did not provide the portion of Federici's deposition that presumably contained his biographical information. *See* Flynn Cert. Ex. 21. In its brief, AKS describes Federici as a third-party engineer. ISC did not dispute that characterization.

mony cited in the claim chart, because the claim terminology had not been properly construed prior to the deponent's comparing the Backplane to that language.[42] ISC offers no authority in support of this assertion and the argument is unavailing. Courts routinely construe claims and then, in the same proceeding, consider prior affidavits, reports, and testimony on the infringement question. *See, e.g., Kraft Foods, Inc. v. International Trading Co.,* 203 F.3d 1362, 1367–71 (Fed.Cir.2000) (affirming finding of non-infringement, supported by prior testimony, in light of new claim construction); *Overhead Door Corp. v. Chamberlain Group, Inc.,* 194 F.3d 1261, 1269–70 (Fed.Cir.1999) (looking to report filed two years prior to claim construction in deciding literal infringement).[43]

ISC offers no testimony to refute AKS's claim chart. In light of AKS's persuasive, uncontradicted evidence, this Court finds that AKS has shown that it is likely to prove literal infringement on claims 1–3. *See M & R Marking Sys., Inc. v. Top Stamp, Inc.,* 926 F.Supp. 466, 474 (D.N.J. 1996) (finding likelihood of success on the merits in light of uncontradicted affidavit in support of infringement).

### B. *Irreparable Harm*

By discrediting ISC's invalidity challenges and demonstrating that it is likely to prove infringement, AKS has satisfied the first prerequisite for preliminary injunctive relief. This Court must now determine whether AKS will suffer irreparable harm in the absence of an injunction.

On a motion for a preliminary injunction, a patentee that clearly shows a likelihood of success on the merits of patent validity and infringement is entitled to a presumption of irreparable harm. *See PPG Industries, Inc. v. Guardian Industries Corp.,* 75 F.3d 1558, 1566–67 (Fed. Cir.1996). Here, AKS's refutation of each of ISC's validity challenges to the '632 patent and its essentially undisputed evidence of literal infringement constitute a clear showing of likelihood of success on the merits. Accordingly, irreparable harm to AKS is presumed.

This presumption is rebuttable, however. The presumption simply places the burden on ISC "to produce evidence sufficient to establish that [AKS] would not be irreparably harmed by an erroneous denial of its motion for preliminary injunction." *Polymer Technologies,* 103 F.3d at 974.

As a preliminary matter, ISC notes correctly that the only harm that the Court may consider in connection with patent infringement must have occurred since the issuance of the patent on January 5, 1999. *See* 35 U.S.C. § 271(a); *see also Cohen v. United States,* 203 Ct.Cl. 57, 487 F.2d 525, 527 (1973) ("It is axiomatic that there can be no infringement of a patent prior to its issuance."). Thus, any injuries AKS points to from ISC's Backplane sales in 1997 and 1998 are irrelevant to the present analysis since they did not occur during the term of the patent. *See* Fahey Cert. ¶ 6.

ISC complains that the damages AKS allegedly sustained since the patent issued are also insufficient to warrant relief because they are economic in nature. In

---

**42.** ISC also contends that the claim chart is flawed because it is based on improper comparisons between the two devices at issue. A determination of infringement must be based on a comparison of the alleged infringing device with the claims of the patent, and not a comparison of the alleged infringing device with the patented product. *See Zenith Labs., Inc. v. Bristol–Myers Squibb Co.,* 19 F.3d 1418, 1423 (Fed.Cir.1994). Although at times the deponents were asked to compare the Backplane to the Shield, AKS's counsel also recited the claim language and inquired if the

Backplane was consistent with that language. Hence, this Court properly may rely on these comparisons in evaluating AKS's showing of infringement.

**43.** Furthermore, this Court's claim construction comports with that of AKS. ISC has pointed to nothing to show that AKS's questioning of these deponents relied on a claim construction inconsistent with that of the Court.

support of this argument, ISC cites *Ben Venue Laboratories, Inc. v. Novartis Pharmaceutical Corp.,* 10 F.Supp.2d 446 (D.N.J.1998). In that case, the alleged infringer, a generic drug manufacturer, sought a preliminary injunction ordering the patent holder to remove the brand name of a certain medicine from the Food and Drug Administration's "Orange Book." The court denied relief, reasoning that, along with failing to demonstrate likelihood of success on the merits, the moving party had failed to show irreparable injury because the harm it alleged from lost market share was "essentially economic harm." *Id.* at 458.

■ In sharp contrast, in the present case, the moving party is the patent holder, not the accused infringer. "Because the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole." *Reebok Int'l Ltd. v. J. Baker, Inc.,* 32 F.3d 1552, 1557 (Fed.Cir.1994). *Ben Venue,* therefore, is inapposite.

Indeed, "economic" considerations such as lost market share, monies expended on product development, and reduced profits are specifically among the factors courts consider in finding that a patent holder will face irreparable harm. *See, e.g., Jacobson v. Cox Paving Co.,* 19 U.S.P.Q.2d 1641, 1653 (D.Ariz.) (enumerating various factors considered by Courts in determining irreparable harm in patent infringement actions), *aff'd,* 949 F.2d 404 (Fed.Cir. 1991). The Federal Circuit has noted that "in the context of a potential loss of market share, there is no presumption that money damages will be inadequate in connection with a motion for a preliminary injunction." *Polymer Technologies,* 103 F.3d at 975. "Competitors change the marketplace." *Id.* ISC's protestations concerning the economic nature of the harm AKS suffers from infringement by a direct competitor fail to rebut the presumption of irreparable harm.

Generally, evidence that will rebut the presumption is:

> evidence that (1) the non-movant has or will soon cease the allegedly infringing activities, thus making an injunction unnecessary; (2) movants have engaged in a pattern of granting licenses under the patent, such that it may be reasonable to expect that invasion of the patent right can be recompensed with a royalty rather than with an injunction; or (3) movants unduly delayed in bringing suit, thereby negating the idea of irreparability.

*Id.* at 973 (citations omitted). None of those circumstances, or any similarly compelling evidence is present here. ISC has thus failed to rebut the presumption and AKS has shown irreparable harm. *See id.*

### C. *Balance of the Hardships*

■ Before this Court may award AKS a preliminary injunction against ISC, it must balance the hardships facing both parties from the grant or denial of injunctive relief. "The magnitude of the threatened injury to the patent owner is weighed, in the light of the strength of the showing of likelihood of success on the merits, against the injury to the accused infringer if the preliminary decision is in error." *H.H. Robertson, Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 390 (Fed. Cir.1987).

For AKS, in the absence of injunctive relief, ISC will continue infringing the '632 patent—continuing to detract from AKS's market share and to compete with AKS in a market in which AKS has the right to exclude.

ISC, in arguing that the balance of equities weighs in its favor, returns to its combination chassis-shield-bracket noninfringement argument. This Court, however, has found that AKS is likely to prove that ISC's product infringes the properly construed '632 patent. Any hardship ISC suffers is a necessary, and predictable, consequence of its decision to sell the

Backplane following the issuance of the '632 patent. *See generally Telebrands Direct Response Corp. v. Ovation Communications, Inc.*, 802 F.Supp. 1169, 1179 (D.N.J.1992) ("Telebrands' plea of hardship is diminished by the company's certain awareness of the economic risks inherent in such a legally precarious business venture."). Unquestionably, ISC will suffer a harm if it defeats AKS's claims at trial. But, in light of AKS's showing on validity and infringement, the balance of hardships clearly tips in favor of AKS.

### D. *Public Interest*

Finally, this Court must consider the impact of injunctive relief on the public interest. Although the public certainly has an interest in lower prices for shielding that may result from increased competition in the marketplace, "[n]o public interest is served by allowing patent infringement." *Telebrands*, 802 F.Supp. at 1170; *see also PPG Indus.*, 75 F.3d at 1567. Whatever interest exists in having more suppliers of shielding put their products on the market is strongly outweighed by the public policy in favor of enforcing patent rights and encouraging inventors to develop new products, and by the showing AKS has made on the other prongs. *See M & R Marking Sys., Inc. v. Top Stamp, Inc.*, 926 F.Supp. 466, 475 (D.N.J.1996).

Accordingly, AKS has satisfied its burden and is entitled to a preliminary injunction barring ISC from infringing claims 1, 2, and 3 of the '632 patent, from manufacturing, selling, distributing, or practicing in any way any product covered by claims 1 through 3 of the '632 patent, and from manufacturing, selling, or distributing the Backplane or any identical or substantially similar part manufactured by ISC under a customer specific number.

### CONCLUSION

For all of the foregoing reasons, ISC's motion for summary judgment is granted in part and denied in part, and AKS's motion seeking a preliminary injunction is granted.

APPENDIX

Diagram A

FIG.2

**Diagram B**

501190

**Diagram C**

Diagram D

FIG.1

Diagram E

FIG.3

FIG.4

FIG.8

## OPINION ON MOTION FOR RECONSIDERATION

GREENAWAY, District Judge.

On April 11, 2000, this Court issued an Opinion and Order (the "April Opinion") in this matter, denying in part ISC's motion seeking summary judgment and granting AKS's request for a preliminary injunction. ISC has now moved, pursuant to Fed.R.Civ.P. 52(b) and 59(e), for amended findings and reconsideration of the grant of preliminary injunctive relief. For the reasons discussed below, ISC's request for reconsideration is denied and its request

for amended findings is granted in part and denied in part.

## DISCUSSION

■ The standard for obtaining relief under Fed.R.Civ.P. 59(e) is a high one.[1] A motion to alter or amend a judgment may only be granted if: (1) an intervening change in the controlling law has occurred, (2) evidence not previously available has become available, or (3) it is necessary to correct a clear error of law or to prevent manifest injustice. *North River Ins. Co. v. Cigna Reinsurance Co.,* 52 F.3d 1194, 1218 (3d Cir.1995); *Bermingham v. Sony Corp. of America, Inc.,* 820 F.Supp. 834, 856–57 (D.N.J.1992), *aff'd,* 37 F.3d 1485 (3d Cir. 1994). The "extraordinary remedy" of reconsideration, pursuant to Rule 59(e) or Local Civil Rule 7.1, is "to be granted sparingly." *NL Indus., Inc. v. Commercial Union Ins. Co.,* 935 F.Supp. 513, 516 (D.N.J.1996) (citations omitted).

Motions for reconsideration must "set[ ] forth concisely the matters or controlling decisions which counsel believes the Judge has overlooked." L. Civ. R. 7.1(g). "The word 'overlooked' is the operative term in the Rule." *Lentz v. Mason,* 32 F.Supp.2d 733, 751 (D.N.J.1999) (citation omitted). "Only dispositive factual matters and controlling decisions of law" that were raised but not considered by the Court on the initial motion "may be the subject of a motion for reconsideration." *Id.*

### I. Standards Governing ISC's Invalidity Challenges

ISC complains that the April Opinion is internally inconsistent and that this Court applied an incorrect standard in considering one of ISC's validity challenges to the '632 patent, raised in opposition to AKS's preliminary injunction motion. ISC

has pieced together disparate excerpts from the April Opinion regarding the on-sale bar to patentability to suggest that the Court found that the evidence of a commercial offer for sale was "in equipoise." Had the Court so found, ISC would have raised a "substantial question" concerning the patent's validity, which would have precluded the issuance of a preliminary injunction. ISC's description of the legal standard governing the grant of preliminary injunctive relief is correct; its interpretation of the Court's findings, however, is mistaken.

■ An alleged infringer raising validity challenges is held to a different burden of proof depending on the setting in which the challenge is raised. When seeking summary judgment on invalidity grounds, as ISC did here, the alleged infringer must offer clear and convincing evidence of invalidity. *See Oney v. Ratliff,* 182 F.3d 893, 895 (Fed.Cir.1999). By contrast, when defending against a patentee's request for preliminary injunctive relief—which ISC also did in this action—the alleged infringer need only "raise[ ] a substantial question concerning validity; i.e., assert[ ] an invalidity defense that the patentee cannot prove 'lacks substantial merit.' " *Helifix Ltd. v. Blok–Lok, Ltd.,* 208 F.3d 1339, 1351 (Fed.Cir.2000) (citing *Genentech, Inc. v. Novo Nordisk,* 108 F.3d 1361, 1364 (Fed. Cir.1997)).[2]

In addressing ISC's summary judgment motion, this Court described the "clear and convincing" evidence standard noted above. Quoting *Oney,* 182 F.3d at 895, the Court noted, "[s]ummary judgment on invalidity grounds is 'inappropriate if a trier of fact applying the clear and convincing standard could find for either party.' " April Opinion at 16–17. Thereafter, in finding that ISC had not established clear

---

1. Motions for reargument in this District are governed by Local Civil Rule 7.1(g). The terms "reconsideration" and "reargument" are used interchangeably. *See Public Interest Research Group v. Yates Indus.,* 790 F.Supp. 511, 512 n. 1 (D.N.J.1991).

2. The burden, of course, on a preliminary injunction motion rests with the patentee, which must show that the validity challenges lacks substantial merit.

and convincing evidence that the Shield was on sale before the critical date, the Court returned to *Oney*'s explanation of the clear and convincing standard. *See* April Opinion at 21 (citing *Oney*, 182 F.3d at 895). The Court's conclusion, through the window of the clear and convincing standard, was that ISC had failed to satisfy its burden. The reiteration of the language from *Oney* that a factfinder "could find for either party" was simply another way to state that the clear and convincing burden had not been met—it did not constitute a finding that the evidence was in equipoise.[3]

Following resolution of ISC's summary judgment motion, the Court turned to AKS's request for preliminary injunctive relief and scrutinized the evidence under the preliminary injunction standard. This Court determined that AKS had refuted the validity challenges by showing that ISC had failed to raise a substantial question as to whether the part depicted in either the October sketch or November drawing was offered for commercial sale prior to the critical date, which would invalidate the patent.[4] The Court found that ISC had not raised a substantial question as to any of its validity challenges. Inso-

far as the Court's earlier finding under the clear and convincing standard could be perceived as inconsistent with its subsequent finding that ISC did not raise a substantial question about validity, that sentence, which appears at the conclusion of Part I(B)(1)(a) of the April Opinion, is stricken and the Court offers the following clarification: Since ISC failed to establish clear and convincing evidence that the Shield was offered for commercial sale prior to the critical date, its motion for summary judgment on that ground must be denied.[5]

## II. *On–Sale Bar to Patentability*

As noted above, in the April Opinion, this Court found that ISC failed to raise a substantial question as to whether the Shield was offered for commercial sale prior to the critical date. In moving for reconsideration, ISC points to a recent Federal Circuit case, *Helifix Ltd. v. Blok–Lok, Ltd.*, 208 F.3d 1339 (Fed.Cir.2000), handed down four days before the Court issued the April Opinion. ISC appears to suggest that *Helifix* necessitates reconsideration as it is an overlooked or intervening change in the law governing the on-

3. Indeed, nothing in the Court's analysis preceding the sentence at issue could reasonably be construed to suggest that the Court had found the parties' evidence to be "in equipoise."

4. This Court notes that it further found that even if the discussions surrounding the October sketch did constitute a commercial offer for sale, ISC introduced no evidence that the device was ready for patenting. That is, no evidence suggested that an individual skilled in the art would be able to practice the '632 patent based on the October sketch. Indeed, in light of the substantial differences in the finger shape of the shielding in the October sketch and that in the '632 patent, the Court found precisely to the contrary. With respect to the November drawing, the record evidence from the file wrapper itself indicated that it failed to disclose the complete invention. Moreover, not a scintilla of evidence in the Court's record connected the November drawing to any commercial discussions. ISC's failure to raise a substantial question

with regard to both prongs of the conjunctive on-sale bar standard was unquestionably clear.

5. This clarification is put forth as an amended finding under Fed.R.Civ.P. 52(b). Rule 52(b) permits this Court, upon a party's motion, to amend its findings or make additional ones. The decision on a motion to amend is committed to this Court's sound discretion. *See Weatherchem Corp. v. J.L. Clark, Inc.*, 163 F.3d 1326, 1336 (Fed.Cir.1998) (reviewing denial of 52(b) motion for abuse of discretion). ISC's request for further amended findings is denied. *See generally Weatherchem*, 163 F.3d at 1336 (finding no abuse of discretion in rejecting "proposed amended findings" that "constituted nothing more than an invitation to the district court to reverse itself"); *see also* 9A Charles Wright & Arthur Miller, Federal Practice & Procedure § 2582 (1995) ("The primary purpose of Rule 52(b) is to enable the appellate court to obtain a correct understanding of the factual issues determined by the trial court . . . .").

sale bar to patentability. It is not. *Helifix* simply discusses the well established legal standards and burdens governing motions for preliminary injunctions and for summary judgment and considers the applicability of the on-sale bar to the facts in that case. *Helifix*'s analysis is guided by the Supreme Court's discussion in *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998), which likewise guided this Court's analysis of the on-sale bar in the April Opinion.

ISC argues that the ultimate outcome in *Helifix*, which considered facts wholly distinct from those before this Court, requires reconsideration and denial of AKS's motion. Specifically, ISC contends that the evidence of a commercial offer at work in *Helifix* warrants reconsideration here. In *Helifix*, prior to the critical date, the patent holder displayed and distributed a brochure for the patented product at a trade show.[6] The brochure expressly taught nine of the patent's twelve elements, and strongly indicated that product testing and experimentation were complete

and that it was ready for sale. *See id.* at 1349. The brochure also contained a "warranty" governing the terms and conditions of sales of goods under "this agreement." *Id.* at 1344.[7] In light of those indicia of a commercial offer, the appellate court found that "the evidence on this point can fairly be said to be very much in equipoise." *Id.* at 1351. As such, the court held that the district court had not abused its discretion in denying the patentee's request for an injunction.

In the April Opinion, this Court considered the entirety of the evidence and found that ISC had failed to make a substantial showing that AKS had offered the Shield for commercial sale prior to the critical date.[8] This Court did not hold that absent a formal written offer for sale, the on-sale bar does not apply. Rather, it rejected ISC's contention—raised only at oral argument—that industry practice, as opposed to standard commercial indicators, provides the proper framework for analyzing whether a product was on-sale. *See* April Opinion at 21 n.18.[9] In *Pfaff*, the Supreme

---

6. There was testimony that company representatives had attended the trade show for "commercial purposes." *Helifix*, 208 F.3d at 1351–52.

7. The warranty, which appeared at the last paragraph of the brochure, provided:
 Seller makes no warranty of any kind, express or implied, except that the goods sold under this agreement shall be of the standard quality of seller, and buyer assumes all risk and liability resulting from the use of the goods, whether used singly or in combination with other goods. Seller neither assumes nor authorizes any person to assume for seller any other liability in connection with the sale or use of the goods sold, and there is no oral agreement or warranty collateral to or affecting this transaction.
 *Id.* at 1344.

8. This Court shall not revisit each piece of evidence that went into its finding that no commercial offer of sale took place. In this regard, ISC now points to certain numbers that appear on the October sketch as evidence that the sketch constituted a commercial offer for sale. Although it did not address these numbers in the initial motions, ISC now advances them as evidence of a price quote for the part featured in the sketch. No testimony

supports this interpretation. Leonard Meier, one of the Shield's inventors who sketched this document, testified that the document contained several sketches, and could not recall what the drawing at the center of the page, closer to the numbers, depicted. *See* Flynn Cert. Ex. 20, Meier Dep. at 71–72. Meier also had no recollection of ever providing a price quote to Sequent. *See id.* at 93. ISC has offered nothing to show that the Court overlooked evidence connecting the numbers at the top of the page to the sketch at the bottom of the page, which is the sketch at issue in this litigation.

9. While industry custom may be relevant to the inquiry, it alone does not control. The Court notes that discussion on this point is somewhat academic given that ISC introduced no evidence that the discussions between the Shield's inventors and representatives of Sequent and Apple constitute commercial offers under "industry custom." ISC's counsel's suggestion of such at oral argument is not competent evidence that the Court may consider. *See Continental Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1265 (Fed.Cir.1991) (noting that attorney's advocacy may not substitute for evidence).

Court focused on standard commercial indicia, an emphasis that the Federal Circuit has recently reaffirmed. *See Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1254 (Fed.Cir.2000) ("In *Pfaff*, the Supreme Court noted that the norms of traditional contract law should be the basis for the on-sale determinations under § 102(b)."). *Helifix* and *Rotec* make clear that this Court applied the proper legal standard. ISC's disagreement with this Court's application of that standard is a matter for appeal, not reconsideration.

### III. *New Evidence and Arguments*

In addition to reasserting arguments and evidence put forth in the initial cross-motions, ISC also urges the Court to evaluate newly submitted evidence of prior art that allegedly invalidates the '632 patent, and to consider a new invalidity challenge to the patent. As noted above, a motion for reargument or reconsideration does not offer losing litigants a second bite at the apple; rather, it is an extraordinary avenue available when the Court has overlooked controlling precedent, new evidence has become available, or to prevent manifest injustice or to correct a clear error of law or fact. ISC's submissions do not meet this criteria.

### A. *IBM Evidence*

 ISC has submitted the affidavit of Kevin R. Qualters, an employee of IBM, concerning the shielding devices IBM has used for the past ten years. Presumably, ISC offers this as "evidence not previously available that has become available" that would impact this Court's determination. This evidence, however, was expressly referenced on the initial motion. In opposition to AKS's preliminary injunction motion, ISC argued that IBM had used tooling that raised a question about the novelty of the Shield but introduced no evidence of such prior art—describing it through hearsay and an unattributed sketch in its brief—and expressed its re-

luctance to issue a subpoena to its customer, IBM, to obtain the evidence. The failure to introduce anything beyond hearsay embedded in attorney argument precluded the Court from considering the defense. *See* April Opinion at 38–39, 39 n.35.

Now, having gambled in the first instance and lost, ISC seeks to introduce competent evidence of this prior art. That is not the purpose of a motion for reconsideration. *See Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir.1985) ("Where evidence is not newly discovered, a party may not submit that evidence in support of a motion for reconsideration."). Unquestionably, evidence that was argued in ISC's briefs was "available" at the time the original motion was submitted. ISC was not unable to obtain this evidence in time to oppose AKS's motion for a preliminary injunction, it was simply unwilling to do so.

Courts routinely exclude evidence raised for the first time on a reconsideration motion absent an adequate explanation as to why the proffering party did not exercise due diligence to obtain the evidence for the initial motion. *See, e.g., Pavlik v. Lane Ltd./Tobacco Exporters Int'l*, 135 F.3d 876, 882 n. 2 (3d Cir.1998) (refusing to consider previously available affidavit on motion for reconsideration); *Harsco*, 779 F.2d at 909 (affirming district court's refusal to consider affidavit containing evidence available prior to initial motion on motion for reconsideration); *Lentz v. Mason*, 32 F.Supp.2d 733, 751 (D.N.J.1999) (refusing to consider evidence on reconsideration absent adequate explanation for failure to disclose earlier). Indeed, the *Lentz* court noted that it was generally "bound not to consider such new materials, lest the strictures of our reconsideration rule erode entirely." *Lentz*, 32 F.Supp.2d at 751 (citation omitted). Refusing to consider the IBM evidence is even more appropriate here, where the proffering party was fully aware of the existence of the evidence, but made a clear strategic choice—acknowledged in

its submissions—not to obtain and present it.[10]

This Court recognizes that newly submitted evidence should be considered in exceptional cases where its consideration is necessary to correct a clear error of law or fact or to prevent manifest injustice. *See Max's Seafood Café by Lou–Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir.1999) (citing *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir.1995)). In *Max's Seafood*, the district court had found the defendants in contempt of a consent decree in connection with remarks made by a third-party who had been the business partner of one of the defendants. *See id.* at 672–73. In moving for reconsideration, one defendant, Jack–Mack Seafood, LLC, ("Jack–Mack"), sought to introduce its certificate of incorporation—not offered as a defense in the original contempt proceeding—to demonstrate that Jack–Mack did not come into existence until six months after the contumacious statements were uttered. *See id.* at 677. The Third Circuit recognized the fundamental nature of Jack–Mack's subsequent incorporation defense and noted reasons why Jack–Mack would not have raised the defense initially—namely that no evidence was introduced to support contempt liability. *See id.* As Jack–Mack's liability should have been a legal and factual impossibility, the *Max's Seafood* court found that reconsideration in light of that evidence was necessary to prevent a manifest error of fact or law. *See id.* at 678.

The concerns of the *Max's Seafood* court are not present here. If the IBM evidence were of fundamental importance, ISC would not have risked its exclusion by offering only a hearsay account of it in the initial motion. On its motion for reconsideration, ISC has made no showing that exclusion of this evidence will result in manifest injustice or a clear error of law or fact. Thus, it shall not be ·considered.[11]

In addition, because this Court shall not consider the IBM evidence at this late stage, ISC's request for additional findings in connection with that evidence, pursuant to Rule 52(b), is denied.

## B. *35 U.S.C. § 103*

■ In connection with the IBM evidence, ISC raises a new validity challenge to the '632 patent. ISC for the first time argues that the '632 patent violates the patent statute's nonobviousness requirement, set forth at 35 U.S.C. § 103. ISC now contends that the Court must determine whether the differences between the October sketch and the '632 patent would be obvious to a person of ordinary skill in the art. As ISC never raised this challenge in opposing AKS's preliminary injunction request, it is clear that the Court did not "overlook" this never-before-argued ground for invalidity in granting preliminary injunctive relief. ISC has not shown that the failure to consider it will result in manifest injustice or a clear error of law and fact. Undoubtedly, were that

---

**10.** Of course, ISC may offer this evidence for consideration at the trial of this matter.

**11.** ISC relies on an unpublished decision, *Garrett v. Firestone Tire & Rubber Co.*, Civ. No. 88–0708(CSF), 1989 U.S. Dist. LEXIS 2436 (D.N.J. March 7, 1989), to suggest that "consideration of new evidence [is] particularly appropriate where reconsideration [is] sought for interlocutory judgment." ISC Reply Br. at 8. In *Garrett*, however, the court agreed to consider newly introduced, but not newly discovered, evidence because the denial of summary judgment for which reconsideration was sought did not dispense with all claims and was not certified for interlocutory appeal. *See id.* at *6. Here, by contrast, this

Court's grant of preliminary injunctive relief is immediately appealable to the Court of Appeals for the Federal Circuit. *See* 28 U.S.C. § 1292(a)(1) ("the courts of appeals shall have jurisdiction of appeals from [i]nterlocutory orders of the district courts of the United States ... granting ... injunctions"); 1292(c)(1) (conferring exclusive jurisdiction on Court of Appeals for the Federal Circuit over interlocutory orders falling within § 1292(a)(1) in patent cases); *see also Canon Computer Sys., Inc. v. Nu–Kote Int'l, Inc.*, 134 F.3d 1085, 1087 (Fed.Cir.1998) (exercising jurisdiction over appeal of grant of preliminary injunction).

the case, ISC would have raised the challenge in the first instance. It thus does not justify reconsideration.

## CONCLUSION

For all of the foregoing reasons, ISC's motion for reconsideration is denied and its motion for amended findings is granted in part and denied in part.